**In re William Edward TOWE, a/k/a Edward Towe, and Cora Florence Towe, a/k/a Florence Towe, Debtors.**

**Craig D. MARTINSON, Trustee, and United States of America, Internal Revenue Service and Montana Department of Revenue, Intervenors, Plaintiffs,**

v.

**William Edward TOWE, a/k/a Edward Towe, and Heartland Trust; S.O. Tow Trust; Towe Antique Ford Foundation; Lewis Rector Trust; Towe Farms, Inc., and Towe Foundation, Defendants.**

Bankruptcy No. 90–11695–7.

Adv. No. 92/00133.

United States Bankruptcy Court, D. Montana.

Sept. 26, 1994.

■■■■■■■■■■■■■■■■■■■

See also 173 B.R. 217.

Sherry Scheel Matteucci, U.S. Atty., D. Mont., Victoria L. Francis, Asst. U.S. Atty., Kirk C. Lusty, Eric M. Casper, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, DC, for Craig Martinson, U.S., I.R.S.

Paul Van Tricht, Dept. of Revenue, Office of Legal Affairs, Helena, MT, for Montana Dept. of Revenue.

Carey Matovich, Billings, MT, for William Towe.

Thomas Towe, Billings, MT, for S.O. Tow Trust.

Gerald Murphy, Moulton Law Firm, Billings, MT, for TAFF, Heartland Trust, Lewis Rector Trust, Towe Farms, Inc., Towe Foundation.

### ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this adversary proceeding, the Chapter 7 bankruptcy Trustee and Intervenors, United States of America, Internal Revenue Service (IRS) and the Montana Department of Revenue (DOR) seek turnover of assets held by the various Defendants on grounds such assets are property of the bankruptcy estate under 11 U.S.C. § 541. Each Defendant resists the challenge. Trial of this cause was held on May 9, 10, and 11, 1994, with all parties present. Testimony and exhibits were introduced by each of the parties and post-trial briefs have been filed by the parties. The matter is thus ripe for determination. The parties agree this is a core proceeding under 28 U.S.C. § 157(b)(2)(E), over

which this Court has jurisdiction pursuant to 28 U.S.C. § 1334 and F.R.B.P. 7001.

## A. TRUSTEE'S STANDING

The Defendants argue the Plaintiff Chapter 7 Trustee and the Intervenor Plaintiffs lack standing in this case to "assert causes of action based on the alter ego theory," citing *Williams v. California 1st Bank*, 859 F.2d 664 (9th Cir.1988). *Williams* holds:

We agree with the Eighth Circuit that Congress' express decision to overrule *Caplin* [*v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) ] is "extremely noteworthy." [*In re*] *Ozark Equip. Co.*, 816 F.2d [1222] at 1228. We also share that court's certitude that "Congress' message is clear—*no* trustee, whether a reorganization trustee as in *Caplin* or a liquidation trustee[,] has power under ... the Code to assert general causes of action, such as [an] alter ego claim, on behalf of the bankrupt estate's creditors." *Id.* (Emphasis added).

859 F.2d at 667.

The holding in *Williams* must be considered in light of the facts of that case where the Trustee attempted, through assignment, to bring actions personal to creditors on behalf of the estate. *Williams* holds the "Trustee lacked authority to bring suit on the claims." *Id.* In *Williams*, the Trustee, through assignments, was attempting to recover judgments on claims which were personal to each creditor, and which were not property of the bankruptcy estate. In that context, then, the holding is correct.

■ However, where the Chapter 7 Trustee seeks to recover assets of the Debtor's [1] estate through an alter ego action by piercing the corporate veil, the case law is consistent that the Trustee has standing. As explained in *Koch Refining v. Farmers Union Cent. Exchange*, 831 F.2d 1339, 1348–49; (7th Cir.1987):

However, the Trustee has no standing to bring *personal* claims of creditors. A

cause of action is "personal" if the claimant himself is harmed and no other claimant or creditor has an interest in the cause. But allegations that could be asserted by any creditor could be brought by the trustee as a representative of all creditors. If the liability is to all creditors of the corporation without regard to the personal dealings between such officers and such creditors, it is a general claim. *See 3A Fletcher Cyc Corp.*, §§ 1134, 1277.1 (rev. perm. ed. 1986).

*Koch* and other cases such as *Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153 (5th Cir.1987) rely on the "well-reasoned" approach of *In re Western World Funding, Inc.*, 52 B.R. 743, 783 (Bankr.Nev.1985):

The debtor need not have even a claim of title at the time of bankruptcy, if a creditor could have nevertheless acquired a lien on the property. 4B *Collier* at 574. This expansion of the trustee's lien rights under the Act was carried over to the Code at § 544(a)(1). Its "plain and literal import" gives the trustee of a corporate debtor a lien on all the nonexempt property of directors, officers, and stockholders, under the same conditions that creditors might have reached that property. 4A *Collier* at 435 n. 41. Therefore, the trustee's alter ego claim may be construed as an action to establish the extent of his lien under § 544(a)(1), which the trustee certainly has standing to pursue.

The trustee's standing may also be based on 11 U.S.C. § 541 and § 704. The trustee has the duty to collect and reduce to money the property of the estate. § 704(1). Section 541(a)(1) provides that the estate is comprised of all legal and equitable interests of the debtor, including any chose in action which the debtor might have had against others. 4 *Collier on Bankruptcy* ¶ 541.01 (15th ed.). Under the Nevada alter ego doctrine, the corporation has, in some sense, an equitable interest in the assets of its alter ego, because the corporation and the alter ego are identical. The trustee brings the alter ego

---

1. In this Order the plural "Debtors" shall refer to both William Edward Towe and Cora Florence Towe. The singular "Debtor" shall mean only

William Edward Towe unless otherwise specified.

action to establish this identity. He certainly has standing to seek a declaratory judgment that certain assets are in equity, if not in law, assets of the estate, and thereby subject to his administration.

\* \* \* \* \* \*

In this state, the alter ego is not considered to be a "third party" to whom liability is shifted. In the seminal case of *McCleary Cattle [Co. v. Sewell ]*, the Nevada Supreme Court noted:

> [T]he [creditors] are not seeking to reach assets in the hands of a third party . . . [or] to substitute or add a new party to the old action. For the purposes of execution, the [corporation] and [its alter ego] are to be regarded as identical.

73 Nev. [279] at 282, 317 P.2d 957.

The Court of Appeals for the Ninth Circuit has followed this rationale in remarking that a bankruptcy trustee could be deemed to be in constructive possession of the defendant's assets "by a determination of alter ego, *i.e.*, that the [defendant] and the bankrupt are pragmatically one and the same." *Suhl v. Bumb*, 348 F.2d [869] at 873 [ (9th Cir.1965) ]. Other courts have held that the assets of a debtor-corporation's alter ego are assets of the estate. *See, e.g., Freehling v. Nielon (In re F & C Services, Inc.)*, 44 B.R. 863, 11 C.B.C.2d 1126, 1130 (Bankr.S.D.Fla.1984), and authorities cited therein. *See also Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941).

■ As the Court in *Western World Funding* noted, under Nevada law the alter ego doctrine is an equitable remedy where the corporate entity is disregarded or pierced where (1) the corporation is influenced and governed by the person asserted to be its alter ego; (2) where there is such a unity of interest and ownership that one is inseparable from the other and (3) that adherence to the fiction of separate entity of the corporation would sanction a fraud or promote injustice. 52 B.R. at 777. The Ninth Circuit Court of Appeals in *Towe Antique Ford Foundation v. I.R.S.*, 999 F.2d 1387, 1391 (9th Cir.1993), citing Montana cases, cited two general factors which Montana Courts consider in determining whether to disregard the separate identity of a corporation. First, the party seeking to pierce the corporate veil must show the corporation is the alter ego of the individual. *Id.* Second, there must be a showing that the corporation was used as a subterfuge to defeat public convenience, justify wrong or perpetrate fraud, keeping in mind that the alter ego doctrine is an equitable remedy to curb injustices resulting from the improper use of a corporate entity. *Id.* at 1391–92. The alter ego doctrines described in *Western World Funding* and *Towe Antique Ford Foundation* are thus very similar, if not identical. Indeed, one of the Montana cases cited in *Towe Antique Ford, Meridian Minerals Co. v. Nicor Minerals, Inc.*, 228 Mont. 274, 742 P.2d 456, 462 (1987), cites and relies upon the Nevada case of *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2,* (1979), 95 Nev. 463, 596 P.2d 227, 229, thereby indicating an approval of the Nevada alter ego doctrine.

■ I conclude, therefore, that the Trustee has standing to bring a claim for relief on the basis of the Montana alter ego doctrine. In fact, only the Trustee could prosecute such action to recover assets for the estate. *In re Guyana Development Corp.*, 168 B.R. 892, 909 (Bankr.S.D.Tex.1994) (As a creditor, the IRS has no standing to allege an alter ego theory for the bankruptcy estate absent order of the court allowing the creditor to proceed in exceptional cases where the Trustee unjustifiably refuses to act). Therefore, if the Trustee likewise was prohibited from asserting the alter ego doctrine to prevent an injustice, the wrongdoer would escape unharmed to the detriment of the creditors. Accordingly, the Defendants' assertion the Trustee lacks standing to bring this action is without merit.

With respect to each Defendant, I examine each Defendant separately, although some of the dealings between the corporations, foundations, and trusts necessarily overlap.

1. *Towe Antique Ford Foundation (TAFF)*

A. Plaintiffs claim that TAFF is the alter ego of the Debtor, Edward Towe. This mat-

ter and issue was resolved by the U.S. District Court for the District of Montana in *Towe Antique Ford Foundation v. Internal Revenue Service, et al.*, 791 F.Supp. 1450 (D.Mont.1992), *aff'd*, 999 F.2d 1387 (9th Cir. 1993). Findings of Fact and Conclusions of Law in the district court action were admitted into evidence as U.S. Ex. 9. For purpose of brevity of this Order, I hereby incorporate by reference Findings of Fact 4 through 24 of the district court decision (Ex. 9), 791 F.Supp. at 1451–57. I further adopt and am bound by the holding of *TAFF v. I.R.S.*, 999 F.2d at 1393, that the district court "correctly determined that the United States' levy on the automobiles was justified because TAFF was Towe's alter ego...." *Id.* at 1393. Further, this Court in *United States of America v. Towe (In re Towe)*, 147 B.R. 545, 550–51 (Bankr.Mont.1992) applies the doctrine of collateral estoppel to deny Towe a general discharge by adopting the decision of *TAFF v. I.R.S., supra.*

■ B. The doctrine of collateral estoppel based on the prior federal decision *TAFF v. I.R.S., supra*, likewise applies in this bankruptcy proceeding. *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991); *In re Daley*, 776 F.2d 834, 838 (9th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721. The federal law of collateral estoppel is articulated in *In re Chapman*, 125 B.R. 284, 286 (Bankr.S.D.Cal.1991), cited approvingly in *Bugna v. McArthur, (In re Bugna)*, 33 F.3d 1054, 1057 n. 1 (9th Cir.1994).[2] *Chapman* states:

COLLATERAL ESTOPPEL

[3] For collateral estoppel to apply, the conditions which must be met are as follows: (1) the party against whom estoppel

is asserted must have been a party to the prior adjudication and actively participated in the litigation; (2) the issue that forms the basis for estoppel must have been actually litigated and determined on the merits; (3) the determination of the particular issue must have been necessary or essential to the court's judgment; and (4) the issue to be precluded is identical to the issue in the former action. *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir. 1987).

*Chapman*, 125 B.R. at 286.

■ The issue of the alter ego status of Debtor Edward Towe and TAFF was precisely and finally decided by the U.S. District Court. Even though certain intervenors/investors were not parties to that action, that does not destroy the application of the federal collateral estoppel doctrine. *See Sampsell v. Imperial Paper Corp.*, 313 U.S. 215, 218–19, 61 S.Ct. 904, 906–07, 85 L.Ed. 1293 (1941). Debtor Edward Towe and TAFF were parties to the prior proceedings, the issue framed on the alter ego status of Towe vis-a-vis TAFF was decided against Towe, who actively participated in the prior litigation, the alter ego issue was material to the former judgment, and the alter ego issue presented in the case *sub judice* is identical to that issue presented in the prior proceeding. Thus, the doctrine of collateral estoppel applies in the pending case. As a result, I conclude Defendant TAFF is the alter ego of the Debtor, Edward Towe.

### 2. *Towe Farms*

As to the alter ego status of Towe Farms, Inc. (Towe Farms), and the Debtor Edward Towe, I make the following Findings of Fact.

---

**2.** *Bugna, supra,* states: "In determining the collateral estoppel of a state court judgment, federal courts must, as a matter of full faith and credit, apply that state's law of collateral estoppel." 33 F.3d at 1057 (citations omitted). If one were to apply Montana law on collateral estoppel, there would be no difference in legal doctrine. *Berlin v. Boedecker*, —— Mont. ——, ——, —— P.2d ——, ——, 51 St.Rep. 569, 572–573, 1994 WL 319585, *5 holds:

 Collateral Estoppel is in the nature of issue preclusion. Collateral estoppel may bar an action if: (1) the issue has been decided in a

prior adjudication and is identical to the one presented; (2) a final judgment on the merits was issued; and (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication. *Anderson v. State*, (1991), 250 Mont. 18, 21, 817 P.2d 699, 701. We have said that of the criteria required to establish collateral estoppel, identity of issues is the most important and requires that the precise question has been ligated in the prior actions. *Stapleton v. First Sec. Bank*, (1983), 207 Mont. 248, 258, 675 P.2d 83, 89.

A. Towe Farms is a corporation duly incorporated under the laws of the State of Montana on January 22, 1963. The Certificate of Incorporation was issued by the Secretary of State for the State of Montana on March 8, 1963. Towe Farms has filed annual reports, corporate tax returns and held annual corporate meetings. The creditors of Towe Farms issue billing statements to Towe Farms on its accounts with them, except as hereinafter noted. Debtors Edward Towe and Cora Florence Towe were subjects of tax audits in each year from 1969 to 1982. All tax audits for Edward Towe and Cora Florence Towe for such years have been completed and deficiencies arising from the tax audits have been determined by the United States Tax Court. The decisions involving years 1979 to 1982 were entered in 1988. (Pre–Trial Order Agreed Statement of Facts). Pre-petition, the Debtor Edward Towe was Chairman of the Board of Directors, President, and Chief Executive Officer of Towe Farms. Tr. 324 and 480. Debtor was in charge of the day-to-day management of Towe Farms and made the daily decisions regarding its operations. Tr. 323, 324, 480, 481, 482, 483.

B. Edward Towe controlled the financial affairs of Towe Farms for Edward's personal benefit. As examples, Debtor, as sole signatory, signed Towe Farms checks transferring large sums of money from Towe Farms to Edward Towe, including drafts of $67,000, $70,000, $44,000, $60,000 and $74,000. Tr. 334, 335, 336, 337. U.S. Ex. 69 to 129. Correspondingly, the corporate minutes of the Board of Directors of Towe Farms have no entries approving such disbursements. U.S. Ex. 134–147.

C. Edward Towe traded commodities on behalf of Towe Farms, without corporate authorization from the Board of Directors. Tr. 338, 339, 341. U.S. Ex. 134–147. The Debtor negotiated leases for Towe Farms. Tr. 326.

D. As the alter ego of Grant Investments Fund (Grant Investments) (see Adversary Proceeding No. 91/00166, decided this date), the Debtor obtained unsecured loans of several thousand dollars from Grant for Towe Farms. Tr. 326, 327, 328, 329, 330, 331.

While these transactions were negotiated by the Debtor, the Board of Directors made at best a minimal review of the Debtor's actions, and did not in any instance restrict or repudiate such control over the corporate loans. U.S. Ex. 134–147. No audit by the Board of Directors was ever ordered or directed of the Debtor's loan activities. U.S. Ex. 134–147. The Debtor individually, and without any meaningful action of the Board of Directors, thus directed and controlled the financial affairs of Towe Farms.

E. The Debtor used Towe Farms for Debtor's own personal financial gain. The Debtor was sued by one Clayton Brokerage in Texas, which recovered a judgment against the Debtor individually in the sum of $170,000. Clayton Brokerage brought action on that judgment in the Montana State District Court in Gallatin County, Montana, to set aside conveyances of shares of stock in Towe Farms. Tr. 297, 298. Even though Towe Farms was not a judgment debtor, or party to the Clayton Brokerage action, the Debtor extinguished Debtor's personal liability with Clayton Brokerage by transferring 54 shares of treasury stock of Towe Farms to Clayton Brokerage. Tr. 298. At that time, 1987, the Debtor valued each share of Towe Farms at $4,754.59. U.S. Ex. 157. The contention of Defendant Towe Farms that the Clayton Brokerage judgment was a "nuisance suit" which justified the use of Towe Farms stock to extinguish the Debtor's personal liability is unworthy of belief, since the value of the 54 shares at the date of settlement exceed $250,000 by the Debtor's own financial statement.

F. Towe Farms purchased a family residence for the Debtor in Wibaux, Montana, while Edward Towe was president of Towe Farms. Tr. 590, 593. The Debtors Edward and Cora Towe intended to move into such residence at the time of purchase. Tr. 342. Edward Towe negotiated the purchase price, and thereafter, Towe Farms paid the costs of remodeling. *Id.* Towe Farms granted the Debtors life estates in residences in Bryan, Texas, and Deer Lodge, Montana. Towe Farms paid $8,000 for the life estate in the Deer Lodge home and $10,000 for the life estate in the Texas home. U.S. Ex. 115 and

116. The 1989 Board of Directors' minutes indicate the Debtor reported the life estate in each home was traded and exchanged for an interest in a home in Wibaux, Montana, after the fact, when the Debtor returned to that area. U.S. Ex. 135. p. 2. Towe Farms paid personal expenses of the Debtor for each home for doors, faucets, curtains and household items, U.S. Ex. 96, 108, 113, 114, and 123, as well as insurance on the Texas home. U.S. Ex. 146. Each check was drawn on Towe Farms account and signed solely by Edward Towe.

G. On October 18, 1982, Towe Farms, by Edward Towe as president, executed a "Limited Guaranty" of $300,000 to the First National Bank and Trust of Wibaux, a Towe bank now in receivership for illegal banking practices, to guaranty loans of Edward Towe. U.S. Ex. 148. The corporate minutes of Towe Farms contain absolutely no authorization for such a large guaranty. U.S. Ex. 142. In a financial statement of Towe Farms prepared for the directors under date of 12–31–82, within 3 months of the guaranty, the Debtor fails to list such contingent liability. U.S. Ex. 152. The corporation's annual meeting of stockholders and directors held December 28, 1982, (Ex. 142) states the financial statements were "carefully reviewed" by the President (Debtor), prepared in the Debtor's handwriting, and were perfunctorily approved upon motion of a member of the Debtor's family. I find from this evidence the Debtor used the guaranty for Debtor's own personal benefit without corporate authorization. No monetary consideration was paid by the Debtor to Towe Farms for such guaranty.

H. Through the direction of Edward Towe, Towe Farms issued title and mortgage insurance to condominium buyers financed by Towe's Wibaux bank. Towe Farms has no Montana license to insure title or issue insurance. U.S. Ex. 50, p. 48. This practice of "insuring" Wibaux bank against losses began in 1988, when the Office of the Comptroller of the Currency, investigating the Wibaux bank discovered that Grant Investments, the Debtor's alter ego, was making downpayment loans. The corporate minutes of Towe Farms engaging in such practice, whether legal or illegal, are silent on this matter. Further, Towe Farms, despite the clear language of the insuring documents, did not pay the Wibaux bank on defaulted payments, but instead of collecting the proceeds from Towe Farms, as was its obligation, the bank resold the condominiums and waived the accrued interest owed to the bank, which was a direct, illegal benefit to Towe Farms, orchestrated by the Debtor. U.S. Ex. 50, pp. 50–51; Tr. 350.[3] Edward Towe's explanation at trial that such transactions were never written in the minutes because "[l]ots of our discussions weren't written in the minutes," Tr. 350, shows an incredible disregard of the corporate entity, and clearly demonstrates the total disregard of Montana corporation law against personal self-dealing.

I. The efforts of the Debtor Edward Towe to protect the corporate assets of Towe Farms did not cease on the date of the bankruptcy petition filing in 1990. Debtor directed Towe Farms to reimburse Edward Towe for $26,342 for "reimbursement" of expenses claimed to be due the Debtor since 1983. U.S. Ex. 117. While the Debtor claimed the check was not negotiated, the bank imprinted the dollar amount on the check, showing the check was in fact cashed. These pre-petition expenses were never scheduled as an asset on the bankruptcy petition. Towe Farms paid life insurance premiums on policies transferred to Towe Farms after the I.R.S. filed its notice of levy. On December 11, 1991, a check was written to Debtor, U.S. Ex. 119, as "Balance Due on Loan from 1–10–90." On January 6, 1992, Towe Farms wrote a check for $700 to the Debtor as "reimbursement for expenses paid by E.T. [Debtor] for Towe Farms" without any bill to Towe Farms documenting such expense. U.S. Ex. 129. On September 4, 1990, the Debtor signed a $5,000 check drawn on Towe Farms as "balance due on loan from 1–10–90," U.S. Ex. 119, which loan

---

**3.** "It is a cardinal principle that a director or officer of a corporation will not be permitted to make a private or secret profit out of his official position; he must give to the corporation the benefit of any advantage which he has thereby obtained." 18B Am.Jur.2d *Corporations,* § 1714, p. 568 (1985).

is not documented in the corporate records. This loan of 1–10–90 was made, according to the bank drafts, 6 years after the Debtor admitted Edward Towe was "insolvent", and just one month after filing a bankruptcy petition showing no loans due from Towe Farms. Further, this loan is never shown on the Towe Farms financial statements or reported in the minutes of any meeting of the Board of Directors. Finally, after a series of post-petition payments without documentation of an account owed by Towe Farms to the Debtor, U.S. Ex. 117, 123, 124, 126, 128 and 129, on May 15, 1992, Towe Farms, by signature of the Debtor's family member, Thomas Towe, wrote a check on the corporate account for $15,000 as "Severance Pay." U.S. Ex. 130. Upon examination of such transaction, the Debtor incredibly stated as to why the severance pay was due "You'll have to ask Towe Farms, I don't really know. I didn't do it and I didn't participate in it and was really kind of against accepting it, but Towe Farms thought I should so I did," and then Debtor stated Debtor did not know for what period of time with Towe Farms the severance check was due. Tr. 443. Such payment was made to the Debtor more than 18 months after the Debtor's family member and attorney was elected President and Chairman of the Board of Directors in December, 1991. Tr. 577.

J. The credible evidence shows Towe Farms was incorporated in 1963 by the Debtors' four children to hold farm and ranch properties, each of whom contributed a minimal $100 as the total capital of the corporation. Tr. 578. The evidence, however, shows that the original corporate shell was filled with the present assets of farms acquired by transfers from the Debtor, and by purchasing assets through bank guarantees executed by Edward Towe or from funds of the Debtor's alter ego corporations and trusts. Edward Towe enabled Towe Farms to purchase some of the ranches by guaranteeing the underlying purchase price or loan. Tr. 321 to 323. Sun Dial Land Company (Sun Dial), wholly owned by Edward Towe, gave substantial property to Towe Farms, principally the ranches, Tr. 508, without any consideration for the transfer of such properties, since by the date of transfer in 1980, there

was no indebtedness against the Custer County ranch. Tr. 514. While Thomas Towe claims the ranches had outstanding debt in 1976, so that there was no equity, the financial statements of Towe Farms prepared by the Debtor show substantial equity. Tr. 429; U.S. Ex. 149. The financial exhibit 149 lists equity on the Belfry and McCone County ranches at $1.25 million as of December 21, 1979. The I.R.S. audit of the Debtors' tax returns was ongoing in 1980, the year of transfer. Tr. 428. By 1981, the date of the transfer of the Miles City/Custer County ranches, there was no indebtedness against the property. Further, to pay the mortgage debt against the ranch properties, Towe Farms received contracts of "several thousand dollars" which were owed to Edward Towe individually through Debtor's wholly-owned company Sun Dial, not Towe Farms. Tr. 514–515.

The Sun Dial ranch transaction with Towe Farms is particularly revealing as to how and when Towe Farms received title to the Belfry and Miles City (Custer County ranch) ranches, and the interplay of the Debtor's alter ego entities. Sun Dial took over the Miles City ranch from Jerome, obtained a loan of about $1 million from the Bank of Circle, a Towe bank, and Edward Towe personally guaranteed the loan. The Debtor made a 17% commission on the transaction, or about $16,700, which was then contributed to TAFF. The loan was later refinanced with another alter ego, Grant Investments. Tr. 511–513. Towe Farms then decided to make the loan payments, and so the Debtor not only transferred through Sun Dial the Custer County ranch, but also transferred the Belfry ranch with Towe Farms assuming the mortgage debt. Tr. 513. By 1981, the Custer County ranch was free of debt. The Debtor stipulated that the transfer date was 1980. A Quit Claim Deed from Sun Dial for the Belfry ranch was dated February 2, 1976, notarized by Thomas Towe on December 27, 1979, and not recorded until December 18, 1982. U.S. Ex. 131. Also in 1982, by Quit Claim Deed, Sun Dial transferred the Custer County ranch to Towe Farms. U.S. Ex. 133. In addition, in 1981, substantial cash was simply transferred from Sun Dial to Towe

Farms. Tr. 515. It is agreed by the parties that by December 31, 1981, all assets of Sun Dial went to the Debtor, who contributed the assets to Towe Farms for an increase in the Debtor's stock base in Towe Farms. Throughout the period of the transfers, the Debtor was under audit by the I.R.S. Tr. 427–428. The Debtor nevertheless contends the transfer of the above assets from Sun Dial took place in 1976, when there was no equity in the property. Tr. 429.[4] Yet, the financial statement of Towe Farms prepared by the Debtor for the year 1979, U.S. Ex. 149, lists an equity in ranches of $1,250,000. By 1980, that equity is stated as $2,457,000. U.S. Ex. 150; Tr. 429–430. The 1984 minutes of Towe Farms reflect Towe Farms only began treating the two ranches as assets in 1979, and Towe Farms ratified everything that transpired over the preceding 5 years in corporate minutes dated December 25, 1984. U.S. Ex. 140. Despite Edward Towe's denial at trial that Debtor never felt the ranch had an equity, Tr. 430, Debtor's prior uncontroverted written statements show that testimony lacks credibility. I find the Debtor contrived the entire belated transfer of Debtor's wholly-owned corporate interest in Sun Dial to Towe Farms to evade the potential liability for taxes due the IRS.

K. In 1974, Rector's Garage, Inc. (Rector), a corporation wholly owned by the Debtor, merged with Towe Farms. Rector's assets included automobiles that were transferred from Towe Farms to the Debtor to cancel a debt owed the Debtor. U.S. Ex. 9.

L. Towe Farms loaned $77,800 to the Towe children Trusts to purchase controlling interest in the Wibaux bank on January 15, 1987. The Debtor reported the loans to the Board of Directors at the 1987 annual meeting without any action by the Board being taken to ratify the Debtor's conduct. U.S. Ex. 137. Edward Towe simply made the loans without board approval.

M. TAFF, an alter ego of the Debtor, paid over $40,000 to build a metal building on Towe Farms' property. Tr. 319. Towe Farms, through the Debtor, claimed TAFF was building the structure to pay for several years of back rent, when in fact TAFF had sufficient funds to pay the rent at all times, and even paid rent in 1987. U.S. Ex. 9; 791 F.Supp. at 1454, 1455. It is not credible for Edward Towe and Defendant Towe Farms to contrive such TAFF expenditure for the benefit of Towe Farms when Towe Farms does not show any account receivable for rent due from TAFF on any of its financial statements, all of which were prepared by the Debtor. U.S. Ex. 149–161. The inescapable conclusion is that since the *TAFF* decision in U.S. District Court, 791 F.Supp. 1450, the Debtor sought to transfer TAFF cash to another alter ego, Towe Farms, on the mistaken premise it would be a safe refuge for the asset.

N. The interplay between Edward Towe's alter ego entities is further demonstrated by the evidence that Towe Farms obtained its operating funds from Grant Investments by unsecured loans which reach a high point in 1987, in the sum of $518,876.16. U.S. Ex. 157. As of December 31, 1991, the balance of the unsecured loans was $168,490.82. U.S. Ex. 7. Of course, when one such as Edward Towe is dealing with Debtor's own funds by manipulation between Debtor's alter egos, it explains why such substantial sums in an investment company were unsecured.

O. Finally, expenses of the annual meetings of TAFF, Towe Foundation, and Towe Farms at Christmas time each year in locations such as Oceanside, California; Tucson, Arizona; Sanibel Island, Florida; Cancun and Mazatlan, Mexico, were borne by each entity (⅓ each in 1985–1988 and 20%, 60% and 20%, respectively, in 1989–1990). Ironically, the expenses of the Debtors, their children, and their grandchildren could be construed as personal vacation expenses. For example, in 1988, the minutes show the 1989 meetings were to run from December 21 to December 30, U.S. Ex. 136, and in 1990 from

---

4. This position is simply untenable when one considers that evidence on the Debtor's objection to the IRS Proof of Claim shows Sun Dial reported income of $149,750.51 in 1979 and $139,719.74 in 1980 on its corporate income tax returns. U.S. Ex. 56, 57 (Objection to Proof of Claim Exhibits). If Sun Dial had disposed of its "Ranching" business in 1976, there would certainly be no ranching income in 1979 and 1980.

December 22 to December 29. U.S. Ex. 135. The minutes of Towe Farms consist of one page for each meeting, and are superficial at best. U.S. Ex. 134, 135. Indeed, the stockholder minutes of 1987 adopted a policy that "each grandchild of Edward Towe who is also a stockholder be offered a position on the board of directors after they become 21 years of age, and that if they choose not to accept a position on the board of directors by the time they become married or reach the age of 25, the corporation would have no further obligation for the transportation or other expenses to the annual meeting of such person and their spouses." U.S. Ex. 137. The annual Christmas vacation was therefore more than strictly for the business of the corporation, as contended by the Debtor. As a matter of fact, the minutes show Towe Farms' meetings in 1989 lasted two hours, the 1986 director's meeting lasted one hour, the 1985 directors' meeting lasted 25 minutes, the 1984 stockholders' meeting lasted five hours and 35 minutes (the Belfry and Miles City ranches were discussed in 3 pages of minutes) and the directors' meeting lasted 45 minutes. U.S. Ex. 135, 138, 139, 140. Over a period of 8–10 days in balmy weather, the meeting time for "strictly business" pales in the warm sun.

### TOWE FOUNDATION

I make the following Findings of Fact:

A. Towe Foundation is a not-for-profit charitable corporation organized and originally funded by the Debtor for the primary purpose of supporting Quaker schools. Tr. 458, 571–572. It was organized as a charitable foundation and its assets were to be used only for charitable purposes.

B. From the time of its organization up to the date of the Debtors' bankruptcy, Edward Towe was President and Director of Towe Foundation, DOR Ex. 80 A–B, and all directors and other officers are members of the Debtor's family. Edward Towe was listed as registered agent of the foundation from its origin through 1991. DOR Ex. 80 A–B. The articles of incorporation provide that only lineal descendants of the Debtor may serve as directors of the foundation. Tr. 459; U.S. Ex. 167.

C. Towe Foundation assets were principally invested in Grant Investments, the Debtor's alter ego. Tr. 461. Towe Foundation in 1991, at the request of the I.R.S., transferred its investments from Grant Investments after the U.S. District Court decision finding the Debtor was the alter ego of Grant. Tr. 541–542. In that transfer, the evidence shows the I.R.S., after the Grant decision, informed the foundation that it would be subject to penalties if it continued to invest in Grant. At the beginning of 1991, Towe Foundation had a 53.34 percent interest in Grant. U.S. Ex. 1. Rather than simply having Grant make a distribution of assets to liquidate the foundation's investment, the Debtor decided to fashion the transfer as two purchases, but was without funds to accomplish that scheme. So, on December 31, 1991, Grant wrote a check to Towe Foundation in the amount of $994,500 to cash out the foundation investment in Grant against a Wibaux bank account having a balance of only $11,000. On the same day, Towe Foundation wrote a check to Grant in the amount of $994,561.00 to purchase assets from Grant against a Wibaux bank account with a balance of only $3,000. Both checks cleared January 1, 1992, despite the lack of sufficient funds in each account on which the checks were written. U.S. Ex. 50, p. 16; Tr. 289–290. None of the transfers appear in the minutes of the foundation held on December 19, 1991, shortly before the transaction. U.S. Ex. 167. The Debtor prepared the allocation of the assets to be given to Towe Foundation for the Grant withdrawal and valued Towe Farms stock at $1.00 for 50 shares, U.S. Ex. 7; Tr. 292–293. Yet those 50 shares had a value of $202,387.59 based upon Towe Farm's 1991 financial statement prepared by the Debtor. U.S. Ex. 161. Towe Foundation's assets upon the Grant divestiture were then placed in a new partnership called Wibaux Investment, Tr. 311, which the Debtor had organized. Tr. 311–312. Moreover, Wibaux Investment's place of business is at the Wibaux Insurance Agency which is owned by Towe Farms, the Debtor's alter ego. Tr. 314–315. Thus, the assets never really left the control of the Debtor, Edward Towe.

D. Most of the annual charitable distributions from Towe Foundation have directly benefitted members of the Debtor's family through distribution to TAFF. The uncontroverted evidence shows the following distributions to TAFF to pay its expenses and salaries of Towe's family members. U.S. Ex. 162, 163, 164, 165, 166.

| Year | Total Qualifying Distribution | Payment to TAFF |
|------|------------------|----------|
| 1991 | $36,240.00 | $29,800.00 |
| 1990 | 40,000.00 | 30,400.00 |
| 1989 | 35,600.00 | 24,200.00 |
| 1988 | 30,000.00 | 18,500.00 |
| 1987 | 20,500.00 | 6,500.00 |
| 1986 | 32,425.00 | 19,500.00 |

In 1982, Towe Foundation directors voted that any additional amount needed for qualifying the charitable tax status be distributed to TAFF. U.S. Ex. 176. From 1989 to 1991, TAFF was not a tax exempt organization and thus was not eligible as a recipient of charitable contributions from the foundation. Tr. 598–599.

E. All three of the Debtors' daughters and two grandchildren attended Olney Friend School, which received charitable distributions from the foundation in 1991 ($1,000); 1990 ($500); 1988 ($5,500); 1987 ($7,000.00) and 1987 ($3,025).

F. From the year 1986 through 1991, out of the $194,815 distributed by Towe Foundation for alleged charitable purposes, the sum of $145,925, or 74.9% of the distribution went to the Debtor's alter ego, TAFF, and the Olney Friend School ($17,025). Since the primary stated purpose of the Towe Foundation was to benefit Quaker schools, Tr. 273, L. 16, that charitable purpose was abandoned or disregarded to foster the personal interests of the Debtor and Debtors' family because 66 percent of the qualifying contribution went to TAFF, which clearly has no Quaker school.

G. Members of Debtors' family also became the beneficiaries of Towe Foundation assets. One of the Debtors' daughters receives $1,000 per year as consultation fees. Another daughter receives $3,000 per year as secretary of the foundation, U.S. Ex. 162, 163, 167, 168, and sixty percent (60%) of the cost of travel and expenses of the annual meetings of TAFF, Towe Farms, and Towe Foundation are paid by the foundation for the Christmas junkets.

H. From the foregoing, it is clear that the truism "charity begins at home" applies to the Towe Foundation. The large percentage of its charitable contributions were directed by its President, Edward Towe, for the benefit of Edward's alter ego TAFF and Edward's lineal decedents. Thus the foundation in recent years, rather than being a major help to Quaker schools, was a major strategy to fund the livelihoods of the Debtor's family, through the Debtor's alter ego.

I. While Debtors' daughter and son stated the Debtor did not control and dominate the affairs of the Towe Foundation, Tr. 574, 533, but rather the board of directors directed the charitable contributions, the record cited above shows the overwhelming benefit from those contributions went to the Debtor's alter ego, TAFF, and thus large sums of the contributions were clearly and cleverly mingled with the Debtor's own affairs. I find such actions were the result of the domination of the funds of Towe Foundation by the Debtor.

### HEARTLAND TRUST

I make the following Findings of Fact:

A. Defendant Heartland Trust asserts such trust is a lawful trust under the laws of Montana with the Debtor as Trustee and John H. Jacobson as beneficiary. Jacobson has not been joined as a party defendant in this action. The legal basis of the trust is allegedly based on a letter to Jacobson from the Debtor, signed by each, dated January 21, 1971, which states:

"This is to confirm our oral agreement today by which I have agreed to assign 139⅚ shares of my stock in the Butte Insurance Agency Inc. to the newly created Trust known as the HEARTLAND TRUST which trust is to be for the benefit of your three children with you and your wife having access to the annual income therefrom and the undersigned is to act as trustee." Def. Ex. 1501.

On the date of the bankruptcy petition, the Debtor is listed as Trustee of Heartland Trust. U.S. Ex. 33, p. 7.

B. By a prior letter of instruction dated December 31, 1970, the Debtor directed the transfer of the 139⅚ shares to "Heartland Trust." Def. Ex. 1502.

C. A purported formal Trust Agreement was prepared for Heartland Trust by Debtor's then-attorney Thomas Towe on or about January 5, 1976, but was never executed by the parties. Another form of such document was executed after the bankruptcy petition. Def. Ex. 1505, Tr. 602. Effective August 6, 1992, the Debtor resigned as Trustee for Heartland Trust, Def. Ex. 1506, and Thomas Towe succeeded Debtor as Trustee. Tr. 381.

D. The Debtor invested the Heartland Trust corpus in Grant investments, Tr. 389, which listed Heartland Trust as a partner, on which basis the Debtor signed Grant partnership tax returns as Trustee for Heartland Trust. U.S. Ex. 1–6. During the period of time the Debtor was trustee, the Debtor received a trustee's fee of $8,000 to $12,000 per year. Tr. 381. In 1986, the Debtor unilaterally made a payment of $53,400.00 out of Heartland Trust account in Grant to the account of the Debtor, to reduce the Heartland Trust value because the stock lost value. Tr. 383. Such payment was without consultation with the beneficiary Jacobson. Tr. 383. None of $53,400 was reported as income by the Debtor on his tax returns. Tr. 385. At one point in the Grant trial, the Debtor testified the Debtor would be able to withdraw the whole trust if Debtor wanted to, but the Debtor now recants that testimony as being made in jest. Tr. 386–388. Such inconsistency leaves the Court in no other position than to find the Debtor is not a credible witness. Further, the Debtor, by unilaterally reducing the trust corpus, violated any fiduciary duty the Debtor had to the beneficiary of the trust, assuming the trust was a valid trust under Montana law, which is addressed next with respect to the Lewis Rector Trust.

## LEWIS RECTOR TRUST

I make the following Finding of Facts and Conclusions of Law on the Lewis Rector Trust and Heartland Trust.

A. On December 9, 1970, Edward Towe as grantor and Trustee, executed a formal written Trust agreement conveying property "to the full benefit of Lewis Rector," the beneficiary. The agreement delineates trustee's powers, including how the income and corpus are to be distributed during the lifetime of Lewis Rector and upon his death. The corpus of the trust was shares in Mineral County Insurance Agency, which were invested in Grant Investments. Def. Ex. 1514.

 Under 11 U.S.C. § 541(a), all legal and equitable interest of the Debtor at the date of the bankruptcy petition became property of the estate. One looks to state law to determine the nature of such property interest. *In re Sierra Steel, Inc.*, 96 B.R. 271, 273 (9th Cir. BAP 1989) (the existence and nature of the debtor's interest in property is determined by state law applied in a manner consistent with federal bankruptcy law). Montana adopted a new Trust Code in 1989, patterned generally after the California Probate Code Ann. (1987), Section 15200, which in turn is drawn from Section 17 of the Restatement (Second) of Trusts (1957). Mont.Code Ann. Annotations, § 72–33–201, *Methods of Creating Trust,* Official Comments, p. 376. Mont.Code Ann. § 72–33–201 to 209. Under California law, the elements of an express trust include "a competent trustor, an intention on the part of the trustor to create a trust, a trustee, an estate conveyed to the trustee, an acceptance of the trust by the trustee, a beneficiary, a legal purpose and a legal term." *In re Teichman,* 774 F.2d 1395, 1399 (9th Cir.1985) (citing *Reagh v. Kelly,* 10 Cal.App.3d 1082, 1089, 89 Cal.Rptr. 425, 430 (1970)). Montana's elements of an express trust under the Montana Code and prior law are the same. *McCaffrey v. Laursen,* 215 Mont. 305, 697 P.2d 103 (1985); *Eckart v. Hubbard,* 184 Mont. 320, 602 P.2d 988, 990–91 (1979).[5] Moreover, an

---

5. California's interpretation of its trust code is particularly meaningful to the Montana Code under the long-standing rule that when one jurisdiction adopts a statute from another that adopting jurisdiction also adopts the construction placed on the statute by the highest court of the state from which the statute is taken. *Edgar v. Hunt,* 218 Mont. 30, 706 P.2d 120, 122 (1985); *Ancient Order of Hibernians v. Sparrow,* 29 Mont. 132, 74 P. 197, 198 (1903). Of course, the rule also states the Montana Court will not blindly follow such construction when the decision does

express trust must satisfy the statute of frauds, for a trust is not valid unless in writing, signed by the trustee or the trustor. Mont.Code Ann. § 72–33–208; *Eckart v. Hubbard, supra,* 602 P.2d at 991; *Lynch v. Herrig,* 32 Mont. 267, 80 P. 240 (1905); *Platt v. Platt,* 134 Mont. 474, 334 P.2d 722 (1959). The Lewis Rector Trust satisfies the express trust requirements of Montana law.

■ It is well-settled that property in the debtor's hands that belongs to another does not become property of the estate under § 541(a). *In re Golden Triangle Capital, Inc. (Golden Mortgage Fund # 14 v. Trustee),* 171 B.R. 79, 81 (9th Cir. BAP 1994). The Supreme Court stated in *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 205, n. 10, 103 S.Ct. 2309, 2313–2314, n. 10, 76 L.Ed.2d 515 (1983) that, "[ ] Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition. *See,* § 541(b); H.R.Rep. No. 95–595, p. 368 (1977); S.Rep. No. 95–989 p. 82 (1978)."

4 *Collier on Bankruptcy,* ¶ 541.13, pp. 541–78 and 79 (15th Ed.) explains:

Once the trust relationship has been established, one claiming as a *cestui que trust* thereunder must identify the trust fund or property of the estate, and if such fund or property has been mingled with the general property of the debtor, sufficiently traced the trust property. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate.

As to Heartland Trust, *In re Kulzer Roofing, Inc.,* 139 B.R. 132, 140, 26 C.B.C.2d 1828 (Bankr.E.D.Pa.1992), *aff'd,* 150 B.R. 134 (D.E.D.Pa.1992), applying the principles of an express trust which are identical with those of Montana, states:

A factor commonly recognized as negating the presence of an express trust is the commingling of monies or assets purportedly comprising the *res* (citing cases).... In the absence of a finding of a trust relationship, a debtor-creditor relationship

not appear as founded on the right reasoning. *Grady v. City of Livingston,* 115 Mont. 47, 141 P.2d 346, 351 (1943). In this case, the California

is often said to exist. *Penn Central I [In re Penn Central Transp. Co.], supra,* 486 F.2d [519] at 524 [ (3d Cir.1973) ]; [*In re] Delaware, supra,* 127 B.R. [756] at 75[7] [ (D.Del.1991) ]; and [*In re] Shervin, supra,* 112 B.R. [724] at 734 [ (Bankr.E.D.Pa. 1990) ].

The incompatibility of commingling of funds and a trust relationship flows from the general precept that a trustee, though its legal owner, administers the trust *res* according to the terms of the trust for the benefit of another and, hence, does not use the *res* for the trustee's own purposes. *Sherwin II, [Sherwin v. Oil City National Bank ], supra,* 229 F.2d [835] at 838 [ (3d Cir.1956) ]; [*In re ] Penn Central II, supra,* 392 F.Supp. [960] at 962; and *Shervin, supra,* 112 B.R. at 734.

139 B.R. at 140.

■ The Lewis Rector Trust complies with all of the necessary elements of an express trust. None of the elements of an express trust apply to the Heartland Trust, which was, at best, an oral agreement to create a trust. As to the Lewis Rector Trust, the *res* can be readily identified or traced in Grant. As to the Heartland Trust, the Debtor not only commingled the *res* of that trust, but used the *res* for the Debtor's own account in Grant. Such use of the *res* gives rise to a debtor-creditor relationship between the estate and Jacobson. *Kulzer, supra.*

In addition, section 541(c)(2) provides:

A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

Thus, even if the Plaintiff Trustee seeks to claim the corpus as property of the estate on the alter ego theory, as to the Lewis Rector Trust, it is clear section 541(c)(2) applies to the valid trust agreement and thus excludes such asset as property of the estate. *Patterson v. Shumate,* 503 U.S. ——, ——, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992) holds interpreting § 541(c)(2):

construction is entirely consistent with the Montana Trust Code and prior decisions of the Montana Supreme Court on express trusts.

The natural reading of the provision entitles a debtor to exclude from property of the estate any interest in a plan or trust that contains a transfer restriction enforceable under any relevant nonbankruptcy law.

Since Section 541(c)(1)(A) only avoids restrictions which prevent transfer of the debtor's property to the estate, *In re Farmers Market,* 792 F.2d 1400, 1402 (9th Cir.1986), where a valid trust exists under state law, with the debtor as the trustee and therefore bound by the provisions of the trust to act as a fiduciary for the beneficiary, Section 541(c)(2) excludes that trust corpus from being property of the bankruptcy estate.

In sum, the Debtor divested himself of the property in 1970 through a valid trust, and the Lewis Rector Trust instrument is legally enforceable against the estate by Rector. *See, In re Baquet,* 61 B.R. 495 (Bankr.Mont. 1986) (Restrictions on trust property, if valid under state law, are enforceable against the estate since the trustee's rights rise no higher than those of the debtor.) I hold that the property interests of the Lewis Rector Trust are not property of the Debtor's estate, and thus said Defendant is entitled to dismissal of this action.

As to the Heartland Trust, I find all property held by Grant in that trust account is property of the Debtor's estate since the Debtor never legally created a valid express trust and further commingled the *res* of the trust with the Debtor's own account, resulting in a debtor-creditor relationship between the Debtor and Jacobson. As to the failure to join Jacobson as a necessary and indispensable party Defendant, I conclude that since the Defendant Heartland Trust at all times maintained the Debtor was its trustee under a valid trust, the Debtor as trustee was the necessary party to adjudicate Plaintiff's claim against the trust. F.R.B.P. Rule 7017 adopts Rule 17, F.R.Civ.P., which provides that every action shall be prosecuted in the name of the real party in interest, which includes the "trustee of an express trust." Here the defense by the Debtor as purported trustee of the Heartland Trust would be identical to Jacobson's defense and therefore adequate to protect the interests of the beneficiary. *In re Allustiarte,* 786 F.2d 910, 914, 918–919 (9th Cir.1986) holds:

A person who voluntarily acts as if he or she is a trustee is a *de facto* trustee. *Eisenmann v. Eisenmann,* 52 Ohio Misc. 119, 370 N.E.2d 788, 793 (1976); *accord In re Dakin's Will,* 58 Misc.2d 736, 296 N.Y.S.2d 742, 743 (1968). The acts of a *de facto* trustee are valid as against third parties. *Dakin,* 296 N.Y.S.2d at 743.

\* \* \* \* \* \*

Under Fed.Bank.R. 719 [7019] and Fed. R.Civ.P. 19, the determination of whether a party is indispensable to an action is a two tiered process. [Footnote omitted.] *Provident Bank v. Patterson,* 390 U.S. 102, 108–09, 88 S.Ct. 733, 737–38, 19 L.Ed.2d 936 (1968). First, the trial court must determine if the person must be joined if feasible. Fed.Bank.R. 719 [7019](a) and Fed.R.Civ.P. 19(a). A person shall be joined if "he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest." Fed.Bank.R. 719 [7019](a) and Fed.R.Civ.P. 19(a). As holders of title to the property in dispute, both absent spouses qualify as parties who should be joined if feasible.

If the person must be joined if feasible pursuant to 719 [7019](a) or 19(a) the court must then determine if such person is *indispensable* to the action. In making that determination, the court must balance the four factors set forth in 719 [7019](c) or 19(b). The court must decide whether pursuant to Fed.Bank.R. 719 [7019](c) and Fed.R.Civ.P. 19(b), such person is indispensable, and if so, the action must be dismissed in his or her absence. We believe the third factor set forth in the rules is controlling under these facts. If the court determines that "a judgment rendered in the person's absence will be adequate" *id.* to protect his interests, the person is not indispensable. Joinder is not required where the absent parties' interests are adequately protected by those who are present. *Eldredge v. Carpenters,* 662 F.2d 534 (9th Cir.1981), *cert. denied,* 459 U.S. 917, 103 S.Ct. 231, 74 L.Ed.2d 183

(1982); *accord Mihara v. Dean Witter & Co.*, 619 F.2d 814 (9th Cir.1980); *Owens–Illinois, Inc. v. Lake Shore Land Co.*, 610 F.2d 1185, 1191 (3d Cir.1979).

 The interests of the beneficiary Jacobson were identical with the Debtor's as trustee and were thus protected by the Debtor.[6] It is the law of Montana that: "Jurisdiction over the person upon whom the trust is imposed is pivotal, but all potential beneficiaries need not be parties." *Howard v. Dalio*, 249 Mont. 316, 815 P.2d 1150, 1152 (1991), which also quotes approvingly the *Allustiarte* decision. *Id.* 815 P.2d at 1153. Finally, the Defendants did not raise the lack of indispensable party in Heartland's answer or assert the defense in the Pre–Trial Order contentions and thus such defense is waived. F.R.B.P. 7009 (adopting F.R.Civ.P. 9(a)). Failure to assert the legal existence of a party to be sued by "specific negative averment" is a waiver of the defense. *Allustiarte*, 786 F.2d at 914. I determine that the beneficiary Jacobson's rights were adequately protected in this adversary proceeding and thus Jacobson was not a necessary and indispensable party defendant.

### CONCLUSIONS OF LAW TO OTHER DEFENDANTS

As a starter, concerning in the legal doctrine of alter ego, I quote from *In re Acequia, Inc. (Acequia II)*, 34 F.3d 800, 815 (9th Cir.1994).

> [Clinton] confuses the community and personal assets consisting of corporate stock with the corporate debtor's funds and assets. A stockholder has no authority to use corporate assets for personal debts. (Emphasis in original).

By now, all of the parties and counsel should be very familiar with the Montana law on piercing the corporate veil. At the risk of being repetitious, I quote from *TAFF v. I.R.S.*, 999 F.2d at 1391:

> In Montana, "no concrete formula exists under which a court will disregard the

separate identity of the corporate entity." *Hando [v. PPG Industries Inc.*, 236 Mont. 493], 771 P.2d [956] at 960 [ (1984) ]. The factors relevant to a finding of alter ego include, but are not limited to:

1. Whether the individual is in a position of control or authority over the entity;

2. Whether the individual controls the entity's actions without need to consult others;

3. Whether the individual uses the entity to shield himself from personal liability;

4. Whether the individual uses the business entity for his or her own financial benefit;

5. Whether the individual mingles his own affairs in the affairs of the business entity;

6. Whether the individual uses the business entity to assume his own debts, or the debts of another, or whether the individual uses his own funds to pay the business entity's debts.

*See generally Hando*, 771 P.2d at 960; *Drilcon, Inc. v. Roil Energy Corp., Inc.*, 230 Mont. 166, 749 P.2d 1058, 1063–64 (1988); *Meridian Minerals Co. v. Nicor Minerals, Inc.*, 228 Mont. 274, 742 P.2d 456, 462 (1987); Jody J. Brewster, *Piercing the Corporate Veil in Montana*, 44 Mont.L.Rev. 91, 95–97 (1983); *see also Valley Finance*, 629 F.2d at 172–73.

Despite such lack of "concrete formula," the Debtor argues, not only is the evidence insufficient to pierce the corporate veil of Towe Farms and Towe Foundation, but that the "Montana Supreme Court has never found 'control' to pierce the corporate veil when the individual was not the sole shareholder or majority shareholder," particularly in a reverse piercing case, citing *Cascade Energy and Metals Corp. v. Banks*, 896 F.2d 1557, 1576–77 (10th Cir.1990). The authority and statement relied upon by the Defendants

---

**6.** *In the Matter of Pacific Marine Insurance Company of Alaska in Liquidation, (Pacific Marine Insurance v. Harvest States Cooperative)*, —— Alaska ——, 877 P.2d 264 (1994), relied upon by the Defendant, holds that under general trust law, a trustee can adequately represent the beneficiary in litigation due to the trustee's fiduciary duty,

and therefore the beneficiary need not be a party defendant. *Id.* at 269. Further, *Coverdell v. Mid–South Farm Equipment Assoc., Inc.*, 335 F.2d 9, 13 (6th Cir.1964) holds the trustee is the proper defendant to protect the trust under the Restatement (2d Ed.) of the Law of Trusts, Vol. 1, Sec. 2, p. 2.

ignore the language of *TAFF v. I.R.S., supra*, which states:

> The Montana Supreme Court has not had an occasion to use a reverse piercing theory to allow a creditor of an individual to reach the assets of a business entity that is his alter ego. However, other courts have permitted the use of a "reverse piercing" theory to allow the United States to recover a taxpayer's delinquent tax liability from his alter ego business entity. *See Century Hotels v. United States*, 952 F.2d 107, 110 (5th Cir.1992) (stating that corporation that was alter ego of taxpayer could be liable for taxpayer's tax liability even though taxpayer had no ownership interest in the corporation); *Shades Ridge Holding Co., Inc. v. United States*, 888 F.2d 725, 728 (11th Cir.1989) (corporation that was alter ego of taxpayer was liable for taxpayer's debts even though the government did not prove that the taxpayers owned any of the corporation's stock), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990); *Loving Saviour Church v. United States*, 728 F.2d 1085, 1086 (8th Cir.1984) (unincorporated association that was alter ego of taxpayers is liable for taxpayers' delinquent tax liability); *Valley Finance, Inc. v. United States*, 629 F.2d 162, 172 (D.C.Cir.1980) (stating that a corporation was liable for the tax liability of its shareholder), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981).

999 F.2d at 1390–91.

Even the dissent in *TAFF* noted:

> Notwithstanding that the I.R.S. cites no Montana authority holding a corporation responsible for a person's liability, I believe, in light of *Hando* and similar cases, Montana would so hold when necessary to achieve equity. *Id.* at 1395.

 Since this Court, as well as the Ninth Circuit Court of Appeals in *TAFF*, attempts to predict how the Montana Supreme Court would rule if faced with the same issue, *In re Kirkland*, 915 F.2d 1236, 1238–39 (9th Cir.1990), I determine *TAFF* settles the reverse piercing issue. As to reliance on *Cascade Energy and Metals Corp. v. Banks, supra*, that court noted that absent a clear statement by the Utah Supreme Court adopting reverse piercing, the more conventional theories of recovery would be followed. I believe the Montana Supreme Court as stated in *TAFF v. I.R.S.* would recognize the doctrine. I also note that the remedies available to the Trustee in a reverse piercing case, such as protection of non-debtor investors in *Grant*, would lead to adoption of the doctrine of reverse piercing, for equity can fashion the appropriate remedy. In sum, *Cascade Energy* is a circuit court case construing Utah law, while *TAFF v. I.R.S.* construes Montana law. I therefore reject the holding in *Cascade Energy* relied on by the Defendants.

The simple answer to the Defendants' critique that the Debtor was not a shareholder in Towe Farms at the date of the bankruptcy petition is that the Debtor was a shareholder of Towe Farms until Debtor attempted illegal gifts of the stock to Debtor's family for the purpose of evading taxes and personal liabilities. The Debtor was at all times the president and director of Towe Farms, and exercised dominion over its affairs for the use of other Towe interests and personal gain. As stated in *TAFF v. I.R.S.*, 999 F.2d at 1393:

> Montana law does not require a showing of fraud to pierce the corporate veil in tax collection cases. [*Wolfe v. United States*, 798 F.2d 1241, 1244 (9th Cir.1986)]. In *Wolfe*, plaintiff argued that the district court erred in piercing the corporate veil because the district court "failed to find wrongful or fraudulent conduct by the taxpayer." *Id.* We reasoned that "under Montana law, a corporate entity may be pierced without a positive showing of fraud. Indeed, a corporation will be disregarded where it is used to evade a public duty, such as the paying of taxes." *Id.* ... Thus, it was unnecessary for the district court to make a finding of fraud in order to disregard TAFF as an entity separate and distinct from Edward Towe. It was only required to find that Towe used TAFF to evade taxes.

The record shows that the district court found that Towe used TAFF to evade tax collection.

The same result applies to Towe Farms and Towe Foundation. I find the evidence is clear and convincing that Towe Farms and Towe Foundation, like TAFF, were used to evade the collection of taxes by the I.R.S., which had Edward Towe under audit beginning in 1969, after which date all of the Debtor's manipulations took place.

■ I conclude from the Findings of Fact that:

(1) Debtor used Towe Farms to shield Edward Towe from personal tax liability by attempting to prevent lawful I.R.S. levies on insurance policies transferred to Towe Farms; (2) that Debtor received substantial cash payments from Towe Farms when Debtor became a "self-created insolvent"; (3) that Debtor used Towe Farms to pay for Debtor's personal living and home expenses while insolvent; (4) that Debtor used Towe Farms treasury stocks to resolve and satisfy a substantial judgment for which only the Debtor was personally liable in the Clayton Brokerage case; (5) that Debtor used and mingled Towe Farms' assets to preserve non-performing loans in Debtor's Bank and used Towe Farms' assets to purchase controlling interest in such Bank for Debtor's children; (6) that Debtor used TAFF assets of $40,000 to build a metal structure for Towe Farms to insulate such assets in Towe Farms consistent with Debtor's never-ending scheme to avoid federal and state taxes; (7) that Debtor, without consulting with other directors, or by withholding information from such directors, used Towe Farms assets for Debtor's private business, such as the purchase of commodities; and (8) that the Debtor transferred substantial properties with equity in excess of over $1.2 million to Towe Farms from Debtor's wholly-owned Sun Dial, and cash without any consideration, while under audit by the I.R.S. I therefore conclude the Trustee has shown by clear and convincing evidence, and by more than a preponderance of the evidence, from all of the above facts and circumstances that there is such a unity of interest between Towe Farms and the Debtor under facts where the Debtor personally ignored the corporate enterprise, that it is necessary in order to prevent injustice and to protect tax creditors to disregard the legal fiction of Towe Farms, Inc.

Many of the above Conclusions of Law can also be applied to Towe Foundation. The credible, clear and convincing evidence presented by the Plaintiffs shows Towe Foundation was controlled by the Debtor, who having singularly formed this noble, charitable corporation for the purpose of support to Quaker schools, subverted that purpose into a scheme to support the Debtor's personal living expenses, those of Debtor's lineal descendants, and TAFF. Moreover, Debtor kept tight control over Towe Foundation funds through the use of Debtor's alter ego Grant Investments, where Towe Foundation kept all of its funds.

Even more important, after the Grant decision and the I.R.S. determination that Towe Foundation could be subject to penalties if its investments were continued in Grant, the Debtor perpetrated sham transfers of assets, which resulted in the Debtor continuing Debtor's domination over Towe Foundation assets in Wibaux Investments. Finally, the Debtor commingled Debtor's affairs with those of Debtor's other alter ego entities such as TAFF, and used Towe Foundation "charitable" assets to fund Christmas junkets for the Debtor and for the families of the Debtors. Again, Edward Towe's action completely ignored the corporate entity and disregarded the charitable purpose of Towe Foundation.

All of the transactions of Grant, TAFF, Towe Farms and Towe Foundation are so interwoven that each represents an interest dominated and controlled by the Debtor. An asset, whether a ranch, an antique car, or bank stock, began with the Debtor, and then over the years, with a scheme to avoid taxes and personal debts, became transferred from one alter ego to another, always under the direction of the Debtor. Yet, throughout the maze of illegal use of corporate or foundation shells, the asset still remained available for the Debtor to use to fund Debtor's businesses and lifestyle, with the obvious plan to

avoid payment of Debtor's lawful taxes. In final analysis, the asset remains the same, it only ends up in one or the other of the alter egos of the Debtor for an illegal purpose.

I have also considered the argument of Defendants Towe Farms and Towe Foundation that the I.R.S. is estopped from asserting the alter ego doctrine because the I.R.S. accepted tax returns for each corporation. This argument is specious since it clearly does not apply to the Chapter 7 Trustee, who has exercised the Trustee's duty to collect the assets of the estate from the alter ego corporations. Indeed, judgment in this action will be entered in favor of the Chapter 7 Trustee, not the I.R.S. or DOR, and therefore the estoppel argument is irrelevant. *ANR, Ltd. Inc. v. Chattin,* 89 B.R. 898, 904 (D.Utah 1988) (In view of fundamental bankruptcy policies, it is appropriate to categorize an action based on the alter ego doctrine as property of the estate to be prosecuted by the Chapter 7 Trustee, not a creditor.)

### CHAPTER 7 TRUSTEE'S REMEDY

■ Under the Amended Complaint, the Chapter 7 Trustee seeks turnover of all of the assets which are property of the estate for the purpose of liquidation of such assets in accordance with the Trustee's duties to "collect and reduce to money the property of the estate...." 11 U.S.C. § 704(1). Thus, the Debtor and all corporate officers of TAFF, Towe Farms, Inc., Towe Foundation and Heartland Trust must surrender for the benefit of the Trustee all of the assets, including, not limited to, and subject to post-petition disclosure to the Chapter 7 Trustee, the following:

### TOWE FARMS, INC.

The assets of this entity consist primarily of real estate in the form of various farms, ranches and houses held in the name of said entity.

A listing of this property as of December 31, 1989, as shown on U.S. Ex. 159 is as follows:

**ASSETS:**

| Location and Description | Estimated Value |
|---|---|
| Custer County, Montana Ranch, approx. 14,000 acres | $ 900,000.00 |
| Two McCone County, Montana Ranches, approx. 46,000 acres | 1,200,000.00 |
| Tama County, Iowa Farm, 615 acres | 1,100,000.00 |
| Two large houses and large shop bldg. in Helena, Montana | 240,000.00 |
| Two houses, shop, garage, etc. at Deer Lodge, Montana | 85,000.00 |
| Bal. due on notes purchased from Wibaux Bank | 118,174.20 |
| House and lot at Bryan, Texas, 3812 Holly Drive | 75,000.00 |
| House and 3 lots in Deer Lodge, Montana | 60,000.00 |
| Bal. due on Miles City and Belfry contracts | 77,109.59 |
| 8 shares of stock in Towe Gift Shop | 46,400.00 |
| 5 antique Ford cars purchased in Calgary | 34,000.00 |
| 4960 acres of minerals in Wibaux County, Montana | 24,800.00 |
| 1980 Ford Fiesta, 1984 Ford Diesel Escort; 1984 and 1985 Ford Tempos | 7,500.00 |
| 1984 Kit Companion 21-foot 5th wheel camper trailer | 5,000.00 |

This listing should be supplemented by the inclusion of that property known as the Carbon County, Montana ranch, which is also an asset. Further legal descriptions for the real estate are as follows:

(a) Carbon County, Montana ranch described in U.S. Ex. 131;

(b) Custer County, Montana ranch described in U.S. Ex. 133.

### TOWE FOUNDATION

Prior to January 1, 1992, all assets of Towe Foundation were held by the entity known as Grant Investments Fund, an alter ego of the Debtor. As of December 1, 1990, this investment was valued at $922,900.00. Def. Ex. 134. While held in Grant, such asset was a cash investment of Towe Foundation. Subsequent thereto, these funds were withdrawn from Grant and placed into an entity known as Wibaux Investments. All such assets are property of the bankruptcy estate to be surrendered to the Chapter 7 Trustee from Wibaux Investments, which, although not a defendant, took such assets post-petition with the Chapter 7 Trustee's rights as of the bankruptcy petition date firmly established.

### TOWE ANTIQUE FORD FOUNDATION

All assets of TAFF are property of the estate. These assets are set forth in Def. Ex. 134, 307 and U.S. Ex. 177 to 181. According to these Exhibits, the assets would include the following:

| Location and Description | Estimated Value |
|---|---|
| Cash as of 12/01/90 with Grant | $ 136,500.00 |
| 94 Antique automobiles attached by IRS | $ 783,900.00 |
| 143 Antique cars, trucks and tractors not attached by IRS | $ 1,579,300.00 |
| Antique auto parts stock, tools and equipment, including two transport trucks and six transport trailers | $ 100,000.00 |

All cars that were owned by TAFF, as of the date of filing of the bankruptcy by Edward Towe or purchased by TAFF after that date, are assets of the bankruptcy estate. This would include all vehicles listed in Def. Ex. 489(a), (b), and (c), plus any other vehicles that Trustee may also determine are held in the name of TAFF, or its assignees.

## HEARTLAND TRUST

The assets of this entity include its investment in Grant Investments Fund. As of December 1, 1990, the investment consisted of the credit with Grant of $162,900.00. Def. Ex. 134. Such asset is property of the bankruptcy estate, and turnover of such cash shall be ordered.

This Court has concluded that corpus of the Lewis Rector Trust is not property of the estate, and therefore the Court will enter Judgment in favor of the Defendant, Lewis Rector Trust, dismissing such Defendant from this action. Further, since no evidence was presented by the Plaintiffs that Defendant S.O. Tow Trust held property of the estate (and the contentions of said Defendant are that all corpus was distributed before the bankruptcy petition date except for $66.00), Judgment will be entered for the Defendant S.O. Tow Trust dismissing said Defendant from this action.

IT IS ORDERED Judgment shall be entered for the Plaintiff, Craig Martinson, Chapter 7 Trustee of the estate of William Edward Towe, a/k/a Edward Towe, Debtor, and against the Defendants William Edward Towe, a/k/a Edward Towe, Debtor, Towe Farms, Inc., a Montana corporation, Towe Foundation, a Montana corporation, Towe Antique Ford Foundation, a Montana corporation and The Heartland Trust, directing said Defendants, their officers and directors to forthwith turnover and surrender to the Plaintiff Trustee all assets of said Defendants, including but not limited to and all assets hereinafter discovered, to wit:

## TOWE FARMS, INC.

### ASSETS:

| Location and Description | Estimated Value |
|---|---|
| Custer County, Montana Ranch, approx. 14,000 acres | $ 900,000.00 |
| Two McCone County, Montana Ranches, approx. 46,000 acres | 1,200,000.00 |
| Tama County, Iowa Farm, 615 acres | 1,100,000.00 |
| Two large houses and large shop bldg. in Helena, Montana | 240,000.00 |
| Two houses, shop, garage, etc. at Deer Lodge, Montana | 85,000.00 |
| Bal. due on notes purchased from Wibaux Bank | 118,174.20 |
| House and lot at Bryan, Texas, 3812 Holly Drive | 75,000.00 |
| House and 3 lots in Deer Lodge, Montana | 60,000.00 |
| Bal. due on Miles City and Belfry contracts | 77,109.59 |
| 8 shares of stock in Towe Gift Shop | 46,400.00 |
| 5 antique Ford cars purchased in Calgary | 34,000.00 |
| 4960 acres of minerals in Wibaux County, Montana | 24,800.00 |
| 1980 Ford Fiesta, 1984 Ford Diesel Escort; 1984 and 1985 Ford Tempos | 7,500.00 |
| 1984 Kit Companion 21-foot 5th wheel camper trailer | 5,000.00 |

Carbon County, Montana ranch described in U.S. Ex. 131, attached hereto as Exhibit "A"; Custer County, Montana ranch described in U.S. Ex. 133, attached hereto as Exhibit "B".

## TOWE FOUNDATION

The sum of $922,900.00 held by Wibaux Investments. Subsequent thereto, these funds were withdrawn from Grant and placed into an entity known as Wibaux Investments. All such assets are property of the bankruptcy estate to be surrendered to the Chapter 7 Trustee.

## TOWE ANTIQUE FORD FOUNDATION

| Location and Description | Estimated Value |
|---|---|
| Cash as of 12/01/90 with Grant | $ 136,500.00 |
| 94 Antique automobiles attached by IRS | $ 783,900.00 |
| 143 Antique cars, trucks and tractors not attached by IRS | $1,579,300.00 |
| Antique auto parts stock, tools and equipment, including two transport trucks and six transport trailers | $ 100,000.00 |

together with all other automobiles that were owned by TAFF as of the date of filing of the bankruptcy, by Edward Towe, or purchased by TAFF after that date which are assets of the bankruptcy estate, including but not limited to the inventory listed in Def. Ex. 489(a), (b), and (c), plus any other vehicles that Trustee may also determine are held in the name of TAFF.

**HEARTLAND TRUST**

The cash as of December 1, 1990, in the sum of $162,900.00, with any interest or increments added thereto.

IT IS FURTHER ORDERED the Defendants Lewis Rector Trust and S.O. Tow Trust are hereby dismissed from this action.

The Clerk shall enter Judgment accordingly. This Order constitutes the Findings of Fact and Conclusions of Law pursuant to F.R.B.P. Rule 7052.