**TOWE ANTIQUE FORD FOUNDATION,
a nonprofit Montana corporation,
Plaintiff,**

**v.**

**INTERNAL REVENUE SERVICE, DE-
PARTMENT OF TREASURY, UNITED
STATES of America, Defendant.**

No. CV 89–141–BLG–JFB.

United States District Court,
D. Montana,
Billings Division.

March 5, 1992.

Thomas E. Towe, Towe, Ball, Enright & Mackey, Gerald B. Murphy, Moulton Law Firm, Billings, Mont., for plaintiff.

Lorraine Gallinger, Asst. U.S. Atty., Keith Duet and Kirk Lusty, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTIN, Senior District Judge.

The above-captioned matter came for trial on October 15 and 16, 1991, before Senior United States District Judge James F. Battin, sitting without a jury. Thomas E. Towe and Gerald B. Murphy represented the Plaintiff, Towe Antique Ford Foundation (hereinafter "TAFF"). Kirk C. Lusty and Keith P. Duet, Trial Attorneys, United States Department of Justice, represented the United States of America. The Court, having heard the testimony of the witnesses and having reviewed the exhibits admitted into evidence, makes the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Fed.R.Civ.P.

## FINDINGS OF FACT

1. This is a wrongful levy action brought under § 7426 of the Internal Revenue Code. The Court has subject matter jurisdiction over this action pursuant to Title 26 U.S.C. § 7426 and Title 28 U.S.C. § 1340.

2. Section 7426(a)(1) of the Internal Revenue Code states:

(a) **Actions permitted.—**

(1) **Wrongful levy.—**If a levy has been made on property or property has been sold pursuant to a levy, any person (other that the person against whom is assessed the tax out of which such levy arose) who claims an interest in or a lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary.

3. On or about July 31, 1989, the United States levied on ninety-one antique automobiles located in Sacramento, California and Deer Lodge, Montana in an attempt to satisfy the delinquent federal tax liabilities of Edward and Florence Towe. At issue in this action is the ownership of those ninety-one antique automobiles.

4. When the United States levied on the ninety-one antique automobiles on July 31, 1989, the automobiles were titled in the name of TAFF. *See* Transcript of Trial Proceedings (hereinafter "Tr.") at 41–45 and Pl.'s Ex. 1. TAFF is a nonprofit, charitable corporation organized and operating under the Articles of Incorporation filed with the Secretary of State, State of Montana. TAFF was originally incorporated under the name of Towe Antique Ford Collection. Tr. at 33–34.

5. Thirty-one of the subject automobiles are displayed in the Towe Ford Museum in

Deer Lodge, Montana, which is operated by the Powell County Museum and Arts Foundation ("PCMAF"). These thirty-one automobiles are the subject of a five year lease agreement (with provisions for automatic renewal) between TAFF and PCMAF. *See* Pl.'s Ex. 8.

6. Sixty of the subject automobiles are displayed in the Towe Ford Museum in Sacramento, California, which is operated by the California Vehicle Foundation ("CVF"). These sixty automobiles are the subject of a ten year lease agreement (with provisions for automatic renewal) between TAFF and CVF. *See* Def.'s Ex.E.

7. Edward Towe began purchasing the antique automobiles in the early 1950's. Tr. at 23–24. In 1969, Edward Towe transferred the antique automobiles to Rector's Garage, Inc., a "for profit" corporation wholly owned by him. Tr. at 27. Then in 1974, Rector's Garage, Inc., merged with Towe Farms, Inc. and the automobiles were transferred to Towe Farms, Inc. Tr. at 27. In 1979, Towe Farms, Inc. transferred the automobiles back to Edward Towe in cancellation of a debt which Towe Farms, Inc. owed Edward Towe. Tr. at 29, 296–298, and Pl.'s Exs. 64 & 68.

8. Plaintiff TAFF claims that it is the lawful owner of the antique automobiles in question. According to Plaintiff, Edward Towe, in an effort to keep the automobile collection together in perpetuity, began placing the titles of the antique automobiles in the name of TAFF in 1980. Tr. at 9–10, 30, 34–35. However, on January 9, 1991, a "Bill of Sale" was prepared and executed which essentially states that Edward Towe retains ownership of the automobiles even though some of the titles had been placed in the name of TAFF. This "Bill of Sale" was prepared in an attempt to preserve ownership in Edward Towe until after TAFF's tax-exempt status had been approved and until he could use the charitable contribution deduction. Tr. at 8–10, 45–46 and Pl.'s Ex. 3 ("Bill of Sale" dated Jan. 9, 1981).

Shortly after TAFF's tax-exempt status was granted, Edward Towe prepared a second "Bill of Sale" on October 20, 1981.[1] *See* Pl.'s Ex. 4 (Bill of Sale dated October 20, 1981). In this Bill of Sale, Edward Towe transfers any and all interest he has in the automobiles to TAFF. Plaintiff's claim that Edward Towe prepared this Bill of Sale because he did not want to risk disintegration of the collection should he die before all the automobiles were transferred to TAFF. Tr. at 10, 46–47. Therefore, it is Plaintiff's position that the automobiles were transferred from Edward Towe to TAFF on October 20, 1981, and that TAFF has owned the automobiles since that time. Tr. at 10, Pl.'s Post–Trial Findings of Fact and Conclusions of Law at para. 18 & para. 19, Pretrial Order at para. 9 (Pl.'s Contentions), and Pl.'s Br. in Supp. of Mot. for Summ. J. at 2, 15, & 18.

9. The United States disputes Plaintiff's claim of ownership of the antique automobiles on three alternative grounds. First, the United States maintains that Edward Towe owns the automobiles at issue because he never effected a valid transfer of the automobiles to TAFF. Second, the United States argues that TAFF holds title to the automobiles as Edward Towe's alter ego and nominee. Finally, the United States claims that even if Edward Towe did transfer the automobiles to TAFF, that conveyance was fraudulent as to the United States and should be set aside.

10. A large part of Plaintiff's case relies in whole or in part on the testimony of Edward Towe and on documents prepared by him. The Court has considered Edward Towe's testimony and finds that much of his testimony lacks credibility. This finding is based on the fact that numerous conflicts of interest exist for Edward Towe since he is not only the taxpayer in this litigation, but also the president and a director of TAFF. In addition, the Court notes many internal inconsistencies in Edward Towe's testimony. Thus, based upon Edward Towe's conflicts of interest, the inconsistencies in his testimony, and his demeanor on the witness stand, the Court has discounted those portions of Edward

---

1. Edward Towe personally prepared the Bill of Sale dated October 20, 1981. Tr. at 46–47.

Towe's testimony which are not worthy of belief.

11. The Court reserves judgment at this time as to whether or not Edward Towe transferred the automobiles to TAFF since such a finding is not critical to the outcome in this matter. After all, even *if* Edward Towe did transfer the subject automobiles to TAFF on October 20, 1981, as Plaintiff contends,[2] the United States' levy on the automobiles was proper because (1) TAFF is the alter ego and nominee of Edward Towe, and (2) any conveyance of the automobiles from Edward Towe to TAFF on October 20, 1981, was fraudulent as to the United States.

## I. ALTER EGO AND NOMINEE

12. First, the Court will address those factual findings which are pertinent to the United States' theory that TAFF holds the automobiles in question as the alter ego and nominee of Edward Towe.

13. In seeking to satisfy legitimate tax debts, the government may levy on property held by a corporation or other business entity, when the corporation or other business entity is determined to be the alter ego or nominee of the taxpayer. *Valley Fin., Inc. v. United States*, 629 F.2d 162, 171 (D.C.Cir.1980) (corporation was not considered to be a separate entity for tax purposes since it was the alter ego of the taxpayer); *see also Loving Saviour Church v. United States*, 728 F.2d 1085 (8th Cir.1984) (church was the alter ego of the taxpayer and could be levied on to satisfy taxpayer's delinquent taxes); *United States v. Williams*, 581 F.Supp. 756 (N.D.Ga.1982) (although legal title was in the name of Helen Williams, she held title as the nominee of her son); *Simpson v. United States*, 63 A.F.T.R.2d (P–H) para. 89–514 (M.D.Fla.1989) (title holder held title as nominee of taxpayer).

14. "State law governs the determination of whether there exists an alter ego from whom the government may satisfy the obligation of a taxpayer." *Wolfe v. United States*, 806 F.2d 1410, 1411 (9th

Cir.1986). Therefore, the substantive law of Montana controls the determination of whether TAFF is the alter ego of Edward Towe.

15. In Montana, "no concrete formula exists under which a court will disregard the separate identity of the corporate entity. Use of this remedy depends entirely upon the circumstance of each case." *Hando v. PPG Indus., Inc.*, 236 Mont. 493, 771 P.2d 956, 960 (1989); *see also Valley Fin. Inc.*, 629 F.2d at 172. Factors relevant to the determination of whether a business entity is the alter ego of an individual include the following:

(a) Whether the individual is a majority shareholder, officer, director, trustee, managing partner, or otherwise in a position of authority over the affairs of the entity;

(b) Whether the individual controls and dominates the business entity's actions and affairs without consulting others;

(c) Whether the individual controls and sometimes withholds information from other investors;

(d) Whether the individual uses the business entity to shield himself from personal liability;

(e) Whether the individual uses the business entity for his own personal and financial gain;

(f) Whether the individual mingles his own and his family's affairs in the affairs of the business entity; and

(g) Whether the individual uses the business entity to assume his own debts, or the debts of another, or whether the individual uses his own funds to pay the business entity's debts.

*See generally Drilcon, Inc. v. Roil Energy Corp., Inc.*, 230 Mont. 166, 749 P.2d 1058, 1063–1064 (1988) (court found corporate president to be alter ego of corporation).

16. "[U]nder Montana law, a corporate entity may be pierced without a positive showing of fraud. Indeed a corporation will be disregarded where it is used to evade a public duty, such as the paying of taxes." *Wolfe v. United States*, 798 F.2d

2. *See* Findings of Fact at para. 8 herein.

1241, 1244 (9th Cir.1986) (footnote omitted) (citations omitted).

17. In addition to asserting that TAFF is the alter ego of Edward Towe, the United States asserts that TAFF is also the nominee of Edward Towe. There appear to be no reported Montana decisions which address the issue of what factors are relevant in determining whether a business entity is the nominee of an individual. However, other Courts have considered the following factors to be relevant in determining whether a business entity is the nominee of an individual:

(a) No consideration or inadequate consideration paid by the nominee;

(b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;

(c) Close relationship between transferor and the nominee;

(d) Failure to record conveyance;

(e) Retention of possession by the transferor; and

(f) Continued enjoyment by the transferor of benefits of the transferred property.

See United States v. Miller Bros. Constr. Co., 505 F.2d 1031 (10th Cir.1974) (legal title holder was merely the nominee of the taxpayer); Williams, 581 F.Supp. at 759 (legal title holder was nominee of debtor); United States v. Code Prod. Corp., 216 F.Supp. 281 (E.D.Pa.1963) (title holder was nominee of corporate taxpayer); Tato Int'l Corp. v. United States, 64 A.F.T.R.2d (P–H) para. 89–5124 (S.D.Fla.1989) (United States' levy against assets of corporation was proper since corporation was taxpayer's nominee).

18. It is undisputed that Edward Towe caused TAFF to be incorporated in 1980, and that he is president of TAFF, a member of TAFF's Board of Directors, and the sole officer controlling the day-to-day operations of TAFF. See Tr. at 57, 234–236 and Pl.'s Ex. 70 (Notes from TAFF's Annual Meetings).

19. TAFF paid no consideration to Edward Towe for the antique automobiles. Tr. at p. 94. As Edward Towe testified at trial, "[i]t was a gift or contribution" and he "didn't get a penny back ..." from TAFF. Id.

20. Despite the fact that TAFF's Board of Directors meets once a year, and despite the fact that others apparently perform some administrative functions, it is abundantly clear from the testimony at trial that it is Edward Towe who, in reality, dominates and controls the affairs of TAFF. See Tr. at 181, 340, 349–350. For example:

(a) Edward Towe signed a document, on behalf of TAFF, on January 9, 1981, which essentially states that TAFF does not own the antique automobiles and that Edward Towe has title, ownership and possession of the antique automobiles. See Pl.'s Ex. 3 ("Bill of Sale" dated January 9, 1981). Yet, Andrew Towe, a director and vice-president of TAFF, testified that he did not see the January 9, 1981 "Bill of Sale" until the United States' levy on the automobiles in question. Tr. at 347.

(b) Edward Towe was the only witness at trial who claimed to have any substantial knowledge about when and how the antique automobiles were conveyed from Edward Towe to TAFF. Ernest Hartley and Andrew Towe, who are both officers and directors of TAFF, know little about how or when the automobiles were transferred to TAFF. See Tr. at 302, 347–349.

(c) TAFF is currently paying for the cost of materials to construct a metal shop building on land owned by Towe Farms, Inc. Tr. at 89. This shop will eventually become the property of Towe Farms, Inc. Tr. at 188. Edward Towe testified at trial that the metal structure is being constructed on Towe Farms, Inc. property as a way for TAFF to repay Towe Farms for rent TAFF owes to Towe Farms. Tr. at 229. Andrew Towe is supervising the construction of this building, and he is also vice-president and a director of TAFF, and a shareholder and director of Towe Farms,

Inc.[3] Tr. at 351. Yet, when questioned at trial about a building TAFF is constructing for Towe Farms Inc. and the alleged indebtedness of TAFF to Towe Farms Inc., Andrew Towe knew little about the situation and could only state that "there is some sort of indebtedness owed there ..." Tr. at 351–352.

(d) For nearly two years after Edward Towe allegedly transferred the automobiles to TAFF, Edward Towe repeatedly failed to advise Ernest Hartley, a director of TAFF and the museum director at PCMAF, to make rental payments from PCMAF to TAFF instead of to him personally. *See* Tr. at 74–78, 309–311, and Def.'s Exs. H, I, J, K, L, M, N, O, & P. Apparently, Edward Towe unilaterally decided that it was not necessary to tell Ernest Hartley (both a director of TAFF and museum director at PCMAF) that the antique automobiles had been transferred to TAFF and that the checks should be made payable to TAFF instead of Edward Towe. Edward Towe responded to this evidence at trial by simply stating that in his opinion, "[t]here wasn't any particular occasion to change it [to whom the checks were made payable], everything was working fine." Tr. at 78.

(e) In *Grant Investments Fund v. Internal Revenue Service*, 10 Mont.F.Rep. 421, 432, 1991 WL 208442 (Mont.1991), this Court found that Edward Towe used funds held by Grant Investments to discharge personal obligations and for personal gain. *See* Def.'s Ex. DB. Despite this ruling, the Board of Directors at TAFF are apparently not concerned about the safety of TAFF funds in Grant Investments Fund. After all, they saw no need to call a special meeting or to confer with one another on the phone regarding that decision. Tr. at 349–351, 312–315. This lack of interest in the safety of TAFF assets is further evidence of both Edward Towe's control over the affairs and assets of TAFF, and the lack of any true participation in the affairs of TAFF by others.

21. Edward Towe made substantial cash contributions to TAFF in 1984, 1985, 1986, and 1987. *See* Tr. at 61–74 and Def.'s Exs. AD, AE, & AF ("17% Contribution from Edward Towe").

22. Plaintiff admits and the Court so finds that a close relationship exists between Edward Towe, his family, and TAFF. TAFF's Board of Directors consists of Edward Towe, his wife, his children (except Sara Towe), and Ernest Hartley (his son-in-law). Pl.'s Post–Trial Reply Br. at 15 and Tr. at 79–80. Moreover, Edward Towe is president of TAFF; Andrew Towe, Ernest Hartley and Tom Towe are vice-presidents of TAFF; Florence Towe is secretary of TAFF; and Kristin Towe Hartley is treasurer of TAFF. *See* Pl.'s Ex. 70 (Annual Meeting, Dec. 23, 1990).

23. Edward Towe has "mingled his own and his family's affairs in the affairs" of TAFF, and Edward Towe and his family have continued to benefit from the antique automobiles since the alleged transfer of the automobiles to TAFF. For example, Edward Towe has used assets of TAFF to his own benefit. He has "invested" TAFF funds in Grant Investments Fund "ever since it [TAFF] had the money to invest." *See* Tr. at 358 and Def.'s Exs. CN, CQ, CS, & CT. Edward Towe then used the funds held by Grant Investments Fund to "discharge personal obligations" and "for personal gain." *See* Def.'s Ex. DB at para. 22. This Court found in *Grant Investments Fund,*[4] 10 Mont.F.Rep. at 432:

> Given Edward Towe's egregious and flagrant pattern of self-dealing, his co-mingling of his personal affairs with those

3. The Court also notes inconsistencies between Andrew Towe's testimony at trial and his prior sworn testimony. For example, in his deposition, Andrew Towe testified that it was Edward Towe who determines what is invested in Grant Investments Fund. Tr. 356–357. Yet, at trial, Andrew Towe testified that he "wouldn't say" that Edward Towe is the one who determines what is invested in Grant Investments Fund. Tr. at 355. At trial his answer was more refined, and he was intent on testifying that investing in Grant Investments Fund was considered a "beneficial investment" by the entire board of TAFF and that Edward Towe certainly does not have "exclusive" control over determining what is invested in Grant Investments Fund. *See* Tr. at 355–356.

4. *This Court's decision in Grant Investments* is now on appeal.

of Grant Investments Fund, his use of Grant Investment Fund assets to discharge his own debts, his manipulation of Grant Investments Fund for his own personal gain, his complete dominance and control of Grant Investments Fund, and the prospect of no end to such abuse of his position as manager of Grant Investments Fund, this Court finds that Grant Investments Fund is the "alter ego" of Edward Towe.

*See* Def.'s Ex. DB at para. 24.

Moreover, as previously stated by the Court in paragraph 20(c) above, TAFF is currently paying for the cost of materials to construct a metal shop building on land owned by Towe Farms, Inc. Tr. at 89.[5] "[R]oughly about $18,000 just for materials" has been spent by TAFF on this shop, which will become the property of Towe Farms, Inc. Tr. at 89–90, 188. Significantly, Edward Towe holds the same position at Towe Farms, Inc. as he does at TAFF. He is the president of Towe Farms, is a director of Towe Farms, and is in charge of the "general day-to-day management" of Towe Farms. Tr. at 87. The Towe Farms Board of Directors consists of Edward Towe, Florence Towe and their children and grandchildren. Tr. at 87–88, 230. Moreover, the children and grandchildren of Edward and Florence Towe own Towe Farms, Inc. Tr. at 86–87.

The antique automobiles have also provided two of Edward Towe's children and his son-in-law with jobs. Tr. at 80–81. Andrew Towe, Edward Towe's son, is director of PCMAF's museum in Deer Lodge, where about one-third of the antique automobiles are displayed. *See* Tr. at 331–332 and Def.'s Ex. G (at para. 1).

Kristin Towe Hartley, Edward Towe's daughter, is an employee of Towe Antique Ford Shops, Inc., which is a corporation that operates retail gift shops at the museums in Sacramento, California and Deer Lodge, Montana. Tr. at 186, 81–82. Towe Farms, Inc., Andrew Towe, and Kristin Hartley are the shareholders in Towe Antique Ford Shops, Inc. Tr. at 82. Edward Towe is a director of Towe Antique Ford Shops and was president of that corporation at one time. Tr. at 81–82. Edward Towe, on behalf of TAFF, expressly reserved the right to operate retail shops at the museums as part of the agreement between TAFF and CVF,[6] and as part of the agreement between TAFF and PCMAF. *See* Def.'s Ex. E (at para. 7e) & G (at para. 6) and Tr. at 307.[7]

Ernest Hartley, Edward Towe's son-in-law, is museum director at CVF, which operates the Towe Ford Museum in Sacramento, California. Tr. at 81, 267–268, 272. He has been museum director since the time most of the antique automobiles were moved to Sacramento, California from Deer Lodge, Montana.[8] *See* Tr. at 267–268. Ernest Hartley testified that CVF "invited" him to accompany the automobiles, and Edward Towe testified that CVF insisted that Ernest Hartley accompany the automobiles to California. Tr. at 267–268, 186. However, the Court finds that Edward Towe specifically ensured that TAFF would be the one to select the collection director at the California museum. In fact, before the

---

5. Edward Towe testified at trial that the metal structure was being constructed on Towe Farms' property as a way of repaying Towe Farms for rent that TAFF apparently owes to Towe Farms. Tr. at 229. Edward Towe claims that TAFF did not pay rent to Towe Farms for the use of its property because TAFF did not have the funds to do so. Tr. at 230–231. Yet, Edward Towe's testimony is contradicted by the fact that TAFF did pay rent in 1987; that TAFF had significant sums of money invested in Grant Investments Fund in 1987, 1988, 1989, and 1990; and that TAFF managed to pay a portion of the expenses for its directors' annual meetings in places like Mexico and San Diego. *See* Def.'s Exs. AF (rent paid), CQ, CR, CS, CT (sums invested) and Tr. at 232, 79, 84–86.

Moreover, the Board of Directors of TAFF and Towe Farms "have never determined how much of the value of the building should be offset against the rent." Tr. at 229.

6. The Court notes that Edward Towe *and* Ernest Hartley, on behalf of TAFF, reserved the right to operate the shop at CVF.

7. TAFF apparently transferred the right to operate retail shops at the museums to Kristin Towe Hartley. *See* Tr. at 307.

8. Ernest Hartley was museum director at the Towe Ford Museum in Deer Lodge from 1978 to 1986. Tr. at 254, 257.

antique automobiles were moved to Sacramento, Edward Towe informed CVF that Ernest Hartley would "accompany the main collection to California." Tr. at 226–227. In addition, the Joint Venture Agreement between TAFF and CVF expressly required that the collection director at the California museum be named by TAFF. *See* Def.'s Ex. E (at para. 7d) and Tr. at 303.

24. The Court finds that any transfer of the automobiles from Edward Towe to TAFF on October 20, 1981, was done in anticipation of the occurrence of federal tax liabilities. Moreover, despite this alleged transfer, Edward Towe continues to exercise control over the antique automobiles. As Plaintiff admitted, Edward Towe was clearly aware that outstanding audits existed at the time of the alleged transfer of the automobiles to TAFF on October 20, 1981. Pl.'s Post–Tr. Br. at 15. In fact, Edward Towe was audited for the years 1969–1978, and these audits were pending before the Tax Court at the time Plaintiff alleges Edward Towe transferred the automobiles to TAFF. *Id.* at 15–16. No amounts had been determined at the time of the transfer, and much uncertainty therefore existed as to Edward and Florence Towe's potential federal tax liability. *See* Pl.'s Br. at 16–17.

Furthermore, although the antique automobiles have allegedly been transferred to TAFF and are leased to CVF and PCMAF, Edward Towe still exerts control over the antique automobiles. After all, as the Court has already found, Edward Towe dominates and controls TAFF. Moreover, based on testimony heard at trial, it is abundantly clear that Edward Towe has lost no real control over the antique automobiles. For example, when the officers at PCMAF requested a reduction in the lease payments to TAFF, Edward Towe began looking for a new location for the automobiles, and basically announced "Get rid of this board [the PCMAF board] or the cars go." Tr. at 261–265, 305. Thereafter, the board was "thrown out" and replaced with a new board. Tr. at 263, 305. Ernest Hartley testified that this new board came to Edward Towe and said *"Mr. Towe,*

please leave these cars in Montana." Tr. at 305 (emphasis added). Thus, it is evident that Edward Towe still exerts control over the antique automobiles at issue, and that those dealing with him perceive him to be in control.

## II. FRAUDULENT CONVEYANCE

25. The Court will now address the factual findings pertinent to the United States' theory that any transfer of the automobiles from Edward Towe to TAFF on October 20, 1981, was fraudulent as to the United States and should be set aside.

26. It is well established that the United States may assert fraudulent conveyance as a defense in a wrongful levy action. *See, e.g., F.P.P. Enterprises v. United States*, 830 F.2d 114, 117–118 (8th Cir.1987) (fraudulent conveyance of property to a trust); *Loving Saviour Church*, 728 F.2d at 1086 (taxpayers fraudulently conveyed property to a church to avoid federal tax lien); *Xemas, Inc. v. United States*, 689 F.Supp. 917, 922–923 (D.Minn. 1988), *aff'd*, 889 F.2d 1091 (8th Cir.1989) (transfer of title to property was a sham and fraudulent as to the United States).

27. When the United States asserts fraudulent conveyance as a defense in a wrongful levy action, state law governs the determination of whether the taxpayer fraudulently conveyed the property to the plaintiff. *See Xemas, Inc.*, 689 F.Supp. at 922–923 (district court applied Minnesota's uniform fraudulent conveyance act). Therefore, Montana law governs the determination of whether Edward Towe fraudulently conveyed the automobiles at issue to TAFF.

28. The Uniform Fraudulent Conveyance Act, as adopted by Montana, is controlling in this case because it was the law in Montana at the time of the events at issue in this case. The Court is cognizant of the fact that the 1991 Legislature repealed the Uniform Fraudulent Conveyance Act and replaced it with the Uniform Fraudulent Transfer Act. *See* Mont.Code.

Ann. § 31–2–326, et seq.[9] However, it is well established in Montana that "[n]o law contained in any of the statutes of Montana is retroactive unless expressly so declared." Mont.Code Ann. § 1–2–109. Since the Uniform Fraudulent Transfer Act does not expressly state that it is retroactive, the Uniform Fraudulent Conveyance Act is the governing law in the instant case.

■ 29. A conveyance may be set aside as fraudulent under the Uniform Fraudulent Conveyance Act where the conveyance is made with the actual intent to hinder, delay, or defraud creditors. The Act provides that:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors is fraudulent as to both present and future creditors.

Mont.Code Ann. § 31–2–314. Montana Courts have recognized various factors, commonly referred to as "badges of fraud," which are relevant to the determination of whether actual fraudulent intent exists under § 31–2–314, M.C.A. " 'Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent ... ' " Montana Nat'l Bank v. Michels, 631 P.2d 1260, 1263 (Mont.1981) (quoting Humbird v. Arnet, 99 Mont. 499, 44 P.2d 756, 761 (1935)). The relevant factors or "badges of fraud" include:

A. Lack of consideration;

B. Transfer of the debtor's entire estate;

C. Relationship between the transferor and transferee;

D. Pendency or threat of litigation;

E. Secrecy or hurriedness of the transferor;

F. Insolvency or indebtedness of the transferor;

G. Departure from the usual method of business;

H. Retention by the debtor of possession of the transferred property;

I. Reservation of benefit to the transferor.

O'Connor v. Lewis, 238 Mont. 270, 776 P.2d 1228, 1233 (1989) (although majority of badges of fraud were present, debtor did not convey property with intent to defraud creditors); Montana Nat'l Bank, 631 P.2d at 1263 (conveyance declared fraudulent and set aside); see also United States v. Sellner, 90–2 U.S. Tax Cas. (CCH) para. 50,452, at 85,455–85,456 (D.Mont.1990) ("Where there is lack of consideration, a threat of litigation, and the debtor retains the property, the 'badges of fraud' are present and the conveyance should be set aside.") Actual fraudulent intent may be established by circumstantial evidence. Montana Nat'l Bank, 631 P.2d at 1262–1263.

■ 30. Edward Towe received no consideration from TAFF for transferring the subject antique automobiles to TAFF. See Findings of Fact at para. 19 herein.

31. As set forth in paragraph twenty-two (22) above, a close relationship exists between Edward Towe, his family, and TAFF.

32. Edward Towe was clearly aware that outstanding audits existed at the time of the transfer, and that his potential federal tax liability was uncertain. See Findings of Fact at para. 24 herein.

33. Both Edward Towe and his immediate family have continued to enjoy the benefits of the antique automobiles at issue since the automobiles were allegedly transferred to TAFF. After all, as stated previously in paragraph twenty (20) above, (1) Edward Towe has used the assets of TAFF to his own benefit by "investing" TAFF funds in Grant Investments Fund and then using the funds in Grant Investments to "discharge personal obligations" and "for personal gain;" (2) TAFF is currently paying for the cost of materials to construct a metal shop building on land owned by Towe Farms, Inc., a corporation owned by Edward and Florence Towe's children and

---

9. The Uniform Fraudulent Transfer Act became effective on October 1, 1991.

grandchildren; and (3) the antique automobiles have provided two of Edward Towe's children and his son-in-law with jobs. *See* Findings of Fact at para. 20 herein.

34. The presence of the aforementioned factors "afford grounds of inference" from which this Court is authorized to conclude that any transfer of the antique automobiles from Edward Towe to TAFF on October 20, 1981, was fraudulent as to the United States. *O'Connor*, 776 P.2d at 1233. As so aptly stated by Justice Dewitt in *Merchants' Nat'l Bank v. Greenhood*, 16 Mont. 395, 41 P. 250, 259 (1895),

> Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know "whence it cometh and whither it goeth." It "loveth darkness rather than light, because its deeds are evil." It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. When we so discover it, the searchlight of a judicial investigation goes back over its trail and lightens it from the beginning to end. As the woodsman follows his game by slight indications, as a broken twig or a displaced pebble, so fraud may become apparent by innumerable circumstances, individually trivial ... but in their mass "confirmation strong as proofs of holy writ."

## CONCLUSIONS OF LAW

1. The Court has subject matter jurisdiction over this action pursuant to Title 26 U.S.C. § 7426 and Title 28 U.S.C. § 1340.

2. In the instant case, TAFF is the "alter ego" of Edward Towe. "[T]he court may ignore existence of the corporate form whenever an individual so dominates his organization 'as in reality to negate its separate personality.'" *Valley Fin., Inc.*, 629 F.2d at 172 (quoting *Quinn v. Butz*, 510 F.2d 743, 758 (D.C.Cir.1975)); *see also Loving Saviour Church*, 728 F.2d at 1085.

3. Moreover, a taxpayer may not use a corporation to "evade a public duty, such as the paying of taxes." *Wolfe*, 798 F.2d at 1244.

4. In the instant case, TAFF is the alter ego of Edward Towe, and the United States was therefore justified in levying on the ninety-one antique automobiles to satisfy Edward and Florence Towe's federal tax liabilities.

5. In addition, the Court concludes that TAFF holds title to the antique automobiles at issue as the nominee of Edward Towe. As previously stated in the Court's Findings of Fact, TAFF paid no consideration for the automobiles; Edward Towe transferred the automobiles in anticipation of the occurrence of federal tax liabilities; he continues to exercise control over the antique automobiles; a close relationship exists between Edward Towe, his family, and TAFF; and they continue to enjoy the benefits of the transferred property. *See Miller Bros. Constr. Co.*, 505 F.2d at 1031; *Williams*, 581 F.Supp. at 759; *Code Prod. Corp.*, 216 F.Supp. at 281; *Tato Int'l Corp.*, 64 A.F.T.R.2d (P–H) para. 89–5124. Thus, the United States' levy on the antique automobiles was justified.

6. Finally, based upon the Court's Findings of Fact, the Court concludes that the alleged conveyance of the antique automobiles from Edward Towe to TAFF on October 20, 1981, was done with the intent to hinder, delay, or defraud the United States. *See O'Connor v. Lewis*, 776 P.2d at 1233; *Montana Nat'l Bank*, 631 P.2d at 1263.

7. Therefore, the alleged conveyance of the subject automobiles from Edward Towe was fraudulent under the Uniform Fraudulent Conveyance Act, as adopted by Montana, and the United States was justified in levying on the ninety-one automobiles to satisfy Edward and Florence Towe's federal tax liabilities.

8. Accordingly, the United States' levy on the ninety-one antique automobiles was not wrongful, and the United States is entitled to judgment in its favor.[10]

10. After observing Edward Towe as a witness at trial, the Court reaffirms its prior ruling that

IT IS THEREFORE ORDERED that the Clerk shall enter judgment in favor of the United States.

The Clerk is directed forthwith to notify counsel for the respective parties of the making of this order.

Edward Towe is a competent witness and capable of testifying as to the ownership history of the antique automobiles. *See* Court Order dated October 4, 1991.