**Orma L. McPHERSON, Plaintiff,**

v.

**The UNITED STATES of America, Defendants.**

**No. CV 08–47–M–DWM.**

United States District Court, D. Montana, Missoula Division.

Sept. 29, 2009.

Danielle Ann Rand Coffman, John B. Dudis, Crowley, Haughey, Hanson, Toole

& Dietrich, Kalispell, MT, Thomas C. Morrison, Morrison & Balukas Law Firm, Helena, MT, for Plaintiff.

Adam F. Hulbig, Rickey Watson, U.S. Department of Justice, Washington, DC, for Defendants.

## ORDER

DONALD W. MOLLOY, District Judge.

### I. Introduction

Robert and Orma McPherson, Canadian citizens residing in Calgary, Alberta, have a vacation property on Flathead Lake in Polson, Montana, hereinafter called the "vacation property."[1] The Government of Canada contends that Robert failed to pay taxes on income earned during years 1995–1998. The United States Internal Revenue Service ("IRS"), acting on behalf of the Canadian government pursuant to Article XXVI A of the United States—Canada Income Tax Convention, issued a levy against Robert reflecting back taxes and penalties in the amount of $9,879,503.35.[2] On January 4, 2008, the IRS issued a Notice of Seizure of the vacation property to satisfy Robert's tax debt, and later arranged for the property to be sold at a public auction held on April 9, 2009. Orma filed this action for wrongful levy and sought a temporary restraining order enjoining the IRS from auctioning the property, alleging that she is the sole owner of the vacation property. The Court issued a temporary restraining order and the parties later stipulated that the IRS will take no further action with respect to the vacation property until the Court has settled the question of ownership in a final judgment on the merits. The parties' cross-motions for summary judgment are now fully briefed, the material facts are not in dispute, and the case is ripe for summary disposition.

### II. Factual Background

Robert and Orma McPherson were married in Canada in 1966. Deposition of Orma McPherson (Doc. No. 18–2) at 9. Orma was employed as a nurse from 1965 until 2006, working continuously during that span with the exception of two periods of maternity leave. Orma Dep. at 5–6. After finishing his studies, Robert started his own company in 1972 and has been in business for himself since that time.[3] Deposition of Robert McPherson (Doc. No. 22–3) at 6–7. Robert estimates that he earned $12,000 CAN in the first year of his business, and his earnings steadily increased from there to a peak earning year of around $275,000 CAN sometime in the 1990s. Robert Dep. at 11–12. Throughout their marriage Robert and Orma have held all of their earnings and other cash assets together in joint accounts. Orma Dep. at 9; Robert Dep. at 14–18.

In 1977, Robert and Orma visited the Flathead Lake area and decided to purchase property there. The couple chose to purchase the vacation property around the same time that they moved their primary residence from Edmonton to Calgary. To facilitate the purchases the McPhersons sold two properties in Edmonton: an acreage titled in Orma's name and purchased with $40,000 CAN given to Orma by her mother; and their residence, which was jointly titled in both names. Orma Dep. at 14–15; Robert Dep. at 25. Funds from

---

1. The vacation property is located at 32046 North Finley Point Road, Polson, Montana.

2. Where possible, this Order will distinguish between Canadian dollars (CAN) and United States dollars (U.S.). It is not clear whether the amount owing under the levy is expressed in Canadian or United States currency, and the difference is not determinative of any issue of consequence in this action.

3. Robert started a second company sometime in the early 1990s. Deposition of Robert McPherson (Doc. No. 22–3) at 9–10.

Orma's employment as a nurse paid the down payment on the jointly-titled Edmonton house when the couple acquired it in the early 1970s, and subsequent mortgage payments had been made out of joint accounts to which both contributed. Orma Dep. at 12, 14. The sale of Orma's acreage yielded $40,000 CAN, which was deposited into joint accounts and commingled with other funds. Orma Dep. at 14–15. The couple made a profit from the sale of their Edmonton home in the amount of $50,000 CAN, which was also deposited in joint accounts and commingled with other funds. Orma Dep. at 15–17.

In 1978 the McPhersons purchased a primary residence in Calgary and Robert purchased the vacation property at Flathead Lake. Orma Dep. at 15. The couple bought the Calgary house for $278,000 CAN and furnished a down payment drawn from joint accounts. Orma Dep. at 23. The purchase of the vacation property was negotiated entirely by Robert. Robert Dep. at 21. On January 4, 1978, Robert executed a contract for deed with the seller, Thelma G. Hann, whereby Robert agreed to pay $63,000 U.S. for the vacation property, consisting of a down payment of $18,270.00 U.S., and monthly payments to the seller of $554.59 U.S. for a period of ten years. Contract for Deed, Doc. No. 22–7 at 3. The seller contemporaneously executed a warranty deed conveying her beneficial interest in the property to Robert. Warranty Deed, Doc. No. 22–7 at 2. The warranty deed conveying title to Robert was recorded in Lake County on July 22, 1987. *Id.* Orma's name does not appear on any of the documents related to the purchase of the vacation property from Thelma G. Hann in 1978.

On the same day Robert purchased the vacation property, he and Orma executed a document called a Declaration of Trust. Doc. No. 22–4. Both Robert and Orma state that the Declaration of Trust was intended to ensure that ownership of the vacation property be vested entirely and exclusively with Orma. Orma Dep. at 17, 20–21; Robert Dep. at 25. Robert drafted the Declaration of Trust without legal assistance. Robert Dep. at 26. The Declaration of Trust states that Robert shall convey to Orma his entire beneficial interest in the vacation property, contingent upon Orma's performance of the following obligations:

- Payment of the down payment of $18,270 U.S.
- Payment of the remaining balance through monthly installments of $554.59 U.S., to continue until the balance is paid off in full.
- Agreement to pay all future property taxes, assessments and other impositions on the vacation property.

Doc. No. 22–4 at 2–3.

Paragraph 2 of the Declaration of Trust provides that Orma "will pay all costs associated with the property from 'Orma's' funds in 'Robert's' and 'Orma's' joint bank account or accounts and/or 'Orma's' personal bank accounts (at her option)." Doc. No. 22–4 at 3. In paragraph 4, the agreement states:

[I]t is understood that interests of "Orma" shall be held in trust by "Robert" until such time as the entire purchase price for the property has been paid by "Orma" to Thelma G. Hann. Upon completion of all payments to Thelma G. Hann, "Robert" hereby agrees that title to [the vacation property] shall be registered in the name of Orma L. McPherson and the trust agreement will no longer be applicable.

Doc. No. 22–4 at 3.

Paragraph 7 of the Declaration of Trust provides, "The parties hereto from time to time and at all times shall execute all further deeds and documents as shall rea-

sonably be required in order fully to perform and carry out the intent of this agreement." Doc. No. 22–4 at 3.

The down payment of $18,270 U.S. came from the couple's commingled funds in joint accounts, as did all subsequent monthly payments of $554.59 U.S. Orma Dep. at 23–24. Although it is not possible to trace the precise origin of the funds used to pay for the vacation property, Orma maintains that the $40,000 CAN derived from the sale of her acreage and deposited in joint accounts was "earmarked" for the down payment on the vacation property.[4] Orma Dep. at 23. Orma also says that after the down payment the leftover proceeds from her acreage were put toward the monthly mortgage payments on the vacation property, though she concedes that some of the money may have been used for the down payment on the Calgary residence. *Id.*

During a tumultuous period in the McPhersons' marriage, Orma had the Declaration of Trust recorded in Lake County on July 23, 1987, before the vacation property had been paid off. Orma Dep. at 40; Doc. No. 22–4. The vacation property was paid off in full after ten years, sometime in 1988. Orma Dep. at 25; Robert Dep. at 29. Robert and Orma did not execute a document conveying title to Orma at that time, and they have not executed any documents related to title to the vacation property since they executed the Declaration of Trust in 1978. Robert Dep. at 29–30; Orma Dep. at 26–29.

### III. Analysis

#### A. Legal Standards

##### 1. Summary Judgment

A party moving for summary judgment is entitled to such if the party can demonstrate "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the nonmoving party. *Id.* at 252, 106 S.Ct. 2505.

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the moving party has met his initial burden with a properly supported motion, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* at 248, 106 S.Ct. 2505 The nonmoving party may do this by use of affidavits (including his own), depositions, answers to interrogatories, and admissions. *Id.*

In evaluating the appropriateness of summary judgment the Court must first determine whether a fact is material; and if so, it must then determine whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the Court. The applicable substantive law will identify which facts are material.

---

**4.** Given the exchange rate at the time, the value of the proceeds in U.S. dollars from the sale of Orma's acreage was slightly less than $40,000 U.S. Doc. No. 23 at 3 n. 3.

Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment. Factual disputes which are irrelevant or unnecessary to the outcome are not considered. *Anderson,* at 248, 106 S.Ct. 2505

### 2. Wrongful Levy

Upon notice and demand by the IRS, a person who fails to pay any tax within ten days is statutorily subject to collection "by levy upon all property and rights to property (except such property as is exempt under [26 U.S.C. § 6334]) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax." 26 U.S.C. § 6331(a). Section 6335 of the Internal Revenue Code authorizes the public sale of seized property to collect unpaid taxes. 26 U.S.C. § 6335.

The Congress has created a statutory cause of action to allow a non-taxpayer claiming an ownership interest in the levied property to challenge the levy as wrongful. The statute provides:

> If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary.

26 U.S.C. § 7426.

"Property is wrongfully levied if it does not, in whole or in part, belong to the taxpayer against whom the levy originated." *Arth v. United States,* 735 F.2d 1190, 1193 (9th Cir.1984). The burden of proof shifts back and forth between the plaintiff and the IRS, beginning with the require-ment that the plaintiff demonstrate by a preponderance of the evidence that she has an interest in the subject property that is senior to the government's interest. *Turk v. I.R.S.,* 127 F.Supp.2d 1165, 1166 (D.Mont.2000); 26 C.F.R. § 301.7426–1(a)(1)(i)(A). Once the plaintiff has established an interest in the property, the burden shifts to the IRS to prove by "substantial evidence" a nexus between the taxpayer and the property levied on. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to form a conclusion." *Id.* (quoting *Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir.1999)). If the IRS is able to prove a nexus between the taxpayer and the property, the burden shifts back to the plaintiff to prove that the levy is wrongful. *Id.*

The relevant section of the Code of Federal Regulations sets forth four scenarios under which an IRS levy is wrongful. 26 C.F.R. § 301.7426–1(b)(1). The theory of wrongful levy advanced by the Plaintiff in this case is contained in subparagraph (*d*) and provides that a levy is wrongful if "the levy or sale pursuant to levy will or does effectively destroy or otherwise irreparably injure [the Plaintiff's] interest in the property which is senior to the Federal tax lien." *Id.*

### B. Discussion

### 1. The Plaintiff's Interest in the Property

■ In a federal tax case, the nature of a party's legal interest in property is governed by state law, in this case the law of Montana, while the consequences of ownership are controlled by federal law. *United States v. National Bank of Commerce,* 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985).

Orma claims to hold title in the vacation property pursuant to the Declaration of

Trust executed by Robert and Orma in 1978, and argues that Robert's status as the holder of bare legal title under the recorded warranty deed executed by Thelma G. Hann is irrelevant. As support for her contention that Robert's status as named title holder is not controlling, Orma cites *In re Marriage of Engen,* 1998 MT 153, ¶ 31, 289 Mont. 299, 961 P.2d 738. Orma's reliance on *Engen* is misplaced, as the Montana Supreme Court in that case held that the question of title is not controlling under Montana's statutory scheme for distribution of property associated with marital dissolution. *Id.* The Court in *Engen* was applying the state's statute governing division of property, Mont.Code Ann. § 40–4–202(1), which requires a court to equitably apportion property between spouses "however and whenever acquired *and whether the title is in the name of the husband or wife or both.*" (Emphasis added.)

Outside of the martial dissolution context, Montana law preserves the separate nature of individual property and provides that a married person has full rights to his or her property and may convey or transfer such property without the consent or agreement of the spouse. Mont.Code Ann. § 40–2–202. *In re Marriage of Dalley* (1988), 232 Mont. 235, 240, 756 P.2d 1131. Because section 40–2–202 preserves exclusive ownership of a nature that is sufficient to allow transfer property without spousal approval, such ownership is presumably also sufficient to allow for the imposition of a lien or levy over a competing claim of interest by the non-owner spouse. The question remains, however, what is the effect of Robert's status as the named title

holder coupled with the operation of the Declaration of Trust executed by Robert and Orma?

To meet her initial burden, Orma must demonstrate an ownership interest in the property that is senior to the tax levy. She can meet the seniority requirement without difficulty, as any equitable interest vested in Orma would have matured, at the very latest, upon completion of payments to Thelma G. Hann in 1988, long before Robert's alleged failure to pay income tax occurred in 1995.[5] But the nature of her ownership interest, if any, is another question.

Orma contends she holds equitable title to the entire vacation property by operation of the Declaration of Trust, while Robert holds bare legal title due to the couple's failure to execute and record a deed conveying legal title to Orma. The United States argues that Orma cannot meet her burden to show an ownership interest in the property because (1) Orma failed to comply with the terms of the Declaration of Trust; and (2) Robert and Orma never executed and recorded a deed granting title to Orma.

### a. Compliance With the Terms of the Declaration of Trust

■ The parties agree that the Declaration of Trust is a contract for deed under Montana law. A contract for deed is "a contract with the record owner of real property in which it was agreed that the record owner will deliver the deed to the property to the purchaser when certain conditions have been met, such as completion of payments by the purchaser."

---

**5.** For this reason, subsequent events relative to the vacation property, including Robert and Orma's jointly-funded construction of a new home on the property in 1990s, are not relevant to the resolution of that matters before the Court. Robert's and Orma's respective interests in the vacation property, what-

ever they may be, exist as a result of events and circumstances the last of which took place in 1988 upon completion of the payments on the property. The intervening years have seen no subsequent events legally sufficient to alter those interests.

Mont.Code Ann. § 70–20–115(1)(a)(i). The parties further agree that the Declaration of Trust did not, simply by virtue of its execution in 1978, operate to vest fee simple title with Orma. On the question of whether Orma performed her obligations under the Declaration of Trust, the parties offer divergent interpretations of the factual record.

The United States argues that Orma failed to fulfill her responsibilities under the Declaration of Trust because she did not earn enough income at the time of the purchase to make the monthly payments and cover expenses related to the property as contemplated by Paragraph 1 of the Declaration of Trust. Orma estimates that she earned around $500 CAN per month at the time the vacation property was acquired in 1978, which was the equivalent of $458.00 U.S. at that time. Doc. No. 23 at 2 n. 1.[6] The government argues that Orma could not possibly have covered the monthly payment on the property and paid the property taxes on her nursing wages.

The record does not support the government's position. Assuming that Orma's monthly income in 1978 was $458 U.S., she would have been short about $100 U.S. on the monthly payment. The property tax on a $63,000 vacation property in Lake County in 1978 is unknown, but can be assumed not to have exceeded $1,200 per year. Based on those assumptions, Orma would have had a deficiency of $200 per month in 1978, which she could have made up by drawing from the proceeds from the sale of her acreage that were left over after she made the down payment on the vacation property. Those proceeds would have been roughly $20,000 U.S., although

Orma did allow that some of that money could have gone toward the down payment on the couple's home in Calgary. However, even if Orma only retained $10,000 U.S. after making both down payments, she could have covered the monthly deficiency for four years or more before depleting her remaining money from the sale of her acreage. Moreover, Orma testified that he income increased regularly meaning her monthly deficiency would have decreased each year. On these facts, Orma possessed the assets necessary to fulfill her obligations under the Declaration of Trust.

The United States next argues that Orma cannot meet her burden to establish an interest in the property because all of the monthly payments and tax payments on the vacation property came from the couple's commingled assets in joint accounts. This argument fails because the terms of the Declaration of Trust make clear that the couple's contract for deed allows Orma to meet her payment obligations by drawing on assets held in the couple's joint bank accounts. The document reflects the couple's agreement that Orma "will pay all costs associated with the property from 'Orma's' funds in 'Robert's' and 'Orma's' joint bank account or accounts and/or 'Orma's' personal bank accounts (at her option)." Doc. No. 22–4 at 3. The United States argues in essence that the document's reference to "Orma's" funds in the couple's joint accounts is a legal fiction, and the point in true as far as it goes. But there is nothing to prevent two parties to a contract for deed from agreeing to indulge in a legal fiction as part of the terms of their agreement. Orma did not violate the terms of the

---

**6.** Orma makes clear in her deposition that her estimate as to her nursing income in 1978 was a guess, stating, "I'm sorry, I have no understanding of what I received at that time." Orma Dep. at 7. In fact, Orma also estimated that she earned $15 CAN per hour

at that time, which is almost surely in conflict with her guess that she earned $500 CAN per month. If Orma earned $15 CAN per hour and worked only 20 hours per week in 1978, her pre-tax monthly income would have been $1,300 CAN.

contract for deed when payments on the vacation property came from the couple's joint accounts.

Last, the United States argues that Orma failed to comply with the Declaration of Trust because she failed to pay property taxes in the years 2003 and 2004, thereby violating her obligation under Paragraph 1(a)(iii) of the Declaration of Trust. *See* Doc. No. 22–6. The argument is unpersuasive for two reasons. First, the argument is predicated on the mistaken conclusion that the payment of all future property taxes, in perpetuity, is a condition subsequent to the grant of title from Robert to Orma. "A condition subsequent is one referring to a future event upon the happening of which the obligation becomes no longer binding upon the other party if he chooses to avail himself of the condition." Mont.Code Ann. § 28–1–405. When a grant of property is made upon condition subsequent and the grant is subsequently defeated by nonperformance of the condition, the grantee is obligated to reconvey the property to the grantor. Mont.Code Ann. § 70–20–311.

The United States finds a condition subsequent in Robert's conveyance of his interest to Orma "subject to 'Orma' fulfilling her 100% share of all obligations on [the vacation property] including costs to date and all future costs (as outlined in Schedule A)." Doc. No. 22–4 at 2. "Schedule A," as referred to in the Declaration of Trust, is the Contract for Deed between the seller, Thelma G. Hann, and Robert. *Id.* Both the Contract for Deed between Hann and Robert and the Declaration of Trust between Robert and Orma contain language stating that the purchaser pursuant to contract for deed shall pay all future property taxes. Such a provision should be expected to be present in any contract for deed

and should not, by itself, be read to impose a condition subsequent the nonperformance of which would void the grant even after all other conditions have been satisfied. The fact that Robert and Orma did not intend to establish a condition subsequent is evident from Paragraph 4 of the Declaration of Trust, which states,

> [I]t is understood that interests of "Orma" shall be held in trust by "Robert" until such time as the entire purchase price for the property has been paid by "Orma" to Thelma G. Hann. **Upon completion of all payments to Thelma G. Hann, "Robert" hereby agrees that title to [the vacation property] shall be registered in the name of Orma L. McPherson and the trust agreement will no longer be applicable.**

Doc. No. 22–4 at 3 (emphasis added).

A fair reading of the Declaration of Trust compels the conclusion that Robert and Orma did not establish a condition subsequent consisting of payment of property taxes in perpetuity under penalty of forfeiture, but rather that they established a condition precedent consisting of completion of all payments to Thelma G. Hann and payment of all property taxes until the debt to Ms. Hann was paid off.[7] Thus, Orma was not obligated by the operation of a condition subsequent to reconvey the property to Robert upon non-payment of property taxes.

Moreover, if it is assumed that such a condition subsequent continues in effect, it would not compel reconveyance to Robert in this instance because the property taxes were paid, albeit not on the original date due, and because Robert did not choose to avail himself of the condition. *See* Robert Dep. at 36, in which he states that the

---

**7.** "A condition precedent is one which is to be performed before some right dependant thereon accrues of some act dependent thereon is performed." Mont.Code Ann. 28–1–403.

vacation property was not seized and put up for auction because "the taxes were paid in the nick of time." The operation of a condition subsequent is not automatic. It requires that the condition occur *and* that the other party choose to avail himself of the condition by, in the case of a transfer of real property, compelling reconveyance. Mont.Code Ann. §§ 28–1–405, 70–20–311. Orma's rights under the Declaration of Trust are not diminished by the delinquent payment of property taxes.

### b. Operation of the Declaration of Trust

■ Orma has established that she complied with the terms of the Declaration of Trust by making all necessary payments in accordance with the conditions imposed by the document, completing those obligations in 1988. However, Paragraph 7 of the Declaration of Trust stated the couple's agreement to "execute all further deeds and documents as shall reasonably be required in order to fully perform and carry out the intent of this agreement," Doc. No. 22–4 at 3, and this they failed to do. Orma concedes that "Robert should have, under the plain terms of the Declaration of Trust, executed a Deed to Orma McPherson," and that he did not do so. Doc. No. 26 at 5. Based on the couple's failure to execute a deed transferring title from Robert to Orma upon fulfillment of Orma's obligations under their contract for deed, the United States argues that Orma has no interest in the property, or that her interest is only a partial equitable interest. To determine whether Orma has met her initial burden to demonstrate an interest in the vacation property, it is necessary to decide whether Orma's compliance with the terms of the Declaration of Trust is alone sufficient for an interest in the property to vest with Orma.

Montana law favors Orma on this question. A purchaser of property pursuant to a contract for deed holds an equitable title in the property, while legal title "remains vested in the vendor until such time as the contractual provisions are fully performed." *Hannah v. Martinson* (1988), 232 Mont. 469, 471, 758 P.2d 276 (citing *Estate of Wooten* (1982), 198 Mont. 132, 643 P.2d 1196; *Kern v. Robertson* (1932), 92 Mont. 283, 12 P.2d 565).[8] In *Wooten,* a decedent who was the selling party to a contract for deed left an interest in all of his land holdings to several charities. The Montana Supreme Court determined that the decedent's property interest as a seller pursuant to a contract for deed was not an interest in the real property, but rather personalty as the result of the doctrine of equitable conversion. 198 Mont. at 137–139, 643 P.2d 1196. The Court quoted the following passage from its decision in *Kern:*

> "The authorities are in accord that an enforceable contract for the purchase and sale of real property passes to the purchaser the equitable and beneficial ownership thereof, leaving only the naked legal title in the seller, as trustee for the purchaser, and as security for the unpaid purchase price. If the pur-

---

**8.** The United States argues that *Hannah* works against Orma because it stands for the proposition that the equitable interest held by a purchaser pursuant to contract for deed is considered a real property interest subject to the attachment of a judgment lien. Doc. No. 24 at 5–6. "Therefore," the United States argues, "even if the Declaration of Trust established some sort of equitable title in [Orma], that fact would not prevent the sei-zure and sale of the subject property." *Id.* The argument misses a crucial point: an equitable title is an interest subject to the attachment of a judgment lien provided that the holder of the interest is the judgment debtor, as was the case in *Hannah,* 232 Mont. at 471, 758 P.2d 276. Here, Orma is not the delinquent taxpayer, and her property is not the target of the revenue collection efforts at issue in this case.

chaser dies while the contract is in force and effect, his interest passes to his heirs as real property. If the seller dies while the contract is in force and effect, his interest passes to his personal representative as personal property, and not to his heirs."

198 Mont. at 138, 643 P.2d 1196 (quoting *Kern*, 92 Mont. at 288, 12 P.2d 565).

Thus, upon execution of a contract for deed, the seller's interest is converted to personal property, while the entire interest in the real property that is the subject of the transaction is conveyed as equitable title to the purchaser. *Id.; In Re Estate of Rickner* (1974), 164 Mont. 51, 55, 518 P.2d 1160. Such were the prevailing interests during the first ten years after acquisition of the vacation property, before Orma had fulfilled all of the conditions precedent to transfer.

After Orma performed all of her obligations under the Declaration of Trust, including the final payment to Thelma G. Hann in 1988, Robert became obligated to execute a deed transferring legal title to Orma. *Liddle v. Petty* (1991), 249 Mont. 442, 446, 816 P.2d 1066. The couple's failure to execute and record a deed is not explained, although it is clear that Orma's subjective understanding was that she had fully protected her interest by recording the Declaration of Trust in July of 1987. Orma Dep. at 40.

Orma's belief that she had protected herself explains why she took no further action to secure legal title. Nonetheless, she is entitled to specific performance of Robert's obligation to transfer title pursuant to the Declaration of Trust. A party seeking specific performance of a contract must have offered to perform, *Pond v. Lindell* (1981), 194 Mont. 240, 245, 632 P.2d 1107, and "it is to be presumed that the breach of an agreement to transfer real property cannot be adequately relieved by pecuniary compensation." *Baker*

*v. Berger* (1994), 265 Mont. 21, 29, 873 P.2d 940 (quoting Mont.Code Ann. § 27–1–419).

Orma fulfilled her obligations under the Declaration of Trust and is the equitable holder of title to the vacation property. Had she sought specific performance transferring to her legal title to the vacation property, the record before the Court in this case suggests that she would have obtained the remedy. She has met her burden to establish an interest in the vacation property, and the burden now shifts to the United States to prove a nexus between Robert and the vacation property.

### 2. Nexus Between the Taxpayer and the Property

The United States must prove a nexus between Robert and vacation property by substantial evidence. It first attempts to do so by emphasizing Robert's negotiation of the purchase from Thelma G. Hann, his continuous access to and enjoyment of the property since 1978, and his financial contribution to significant improvements to the property in the 1990s.

The argument is unpersuasive. The fact that Robert negotiated the purchase from Ms. Hann is of no consequence; the relevant transaction is not the one by which Robert acquired an interest in the property, but rather the one by which he assigned the entirety of that interest to his wife. Because his wife was the purchaser pursuant to contract for deed and has been the equitable owner of the property since 1978, it is unsurprising that Robert has had access to and enjoyed the property throughout that time. With regard to improvements on the property, all such improvements occurred after Orma became the equitable owner of the vacation property and performed fully under the Declaration of Trust. Given Orma's status as equitable owner of the property, her husband's contribution to a new building on

the property is presumed to be a gift, and does not result in the forfeiture of any part of Orma's interest. *Detra v. Bartoletti* (1967), 150 Mont. 210, 217, 433 P.2d 485.

The United States next argues that Robert maintains an interest in the property as Orma's nominee. This Court discussed the nominee theory in the context of a wrongful levy action in *Turk*, stating that in such cases, "a nominee is essentially a proxy, or even a decoy, for someone else." 127 F.Supp.2d at 1167. The test for nominee status was established in *Towe Antique Ford Found. v. I.R.S.*, 791 F.Supp. 1450 (D.Mont.1992), and requires consideration of the following factors:

(a) No consideration or inadequate consideration paid by the nominee;

(b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;

(c) Close relationship between transferor and the nominee;

(d) Failure to record the conveyance;

(e) Retention of possession by the transferor; and

(f) Continued enjoyment by the transferor of benefits of the transferred property.

*Turk*, 127 F.Supp.2d at 1167 (citing *Towe*, 791 F.Supp. at 1454).

The United States' nominee argument fails for a fundamental reason, which is exemplified by consideration of factor (b). It is Robert, not Orma, who would have the incentive to establish a nominee as a "decoy" in this case, because Robert is the taxpayer whose property is subject to levy. In *Turk* and *Towe*, it was not the taxpayer who was the alleged nominee or alter ego but rather another person or entity not subject to tax liabilities. In arguing that Robert is Orma's nominee, the United States gets the nominee theory backwards; it makes no sense for Orma, who has no tax liability, to make Robert, who is subject to a revenue collection action, her nominee.

Consideration of the remaining factors confirms that Robert is not Orma's nominee. Factors (c), (e), and (f) might tend to suggest an illegitimate transfer, but carry little weight in light of factors (a) and (d), as Orma gave adequate consideration in the form of payment of all costs associated with the acquisition and maintenance of the property as contemplated by the Declaration of Trust, and recorded the document to protect her interest.

The best evidence of a nexus between Robert and the vacation property is his status as the holder of bare legal title. But Montana law is clear that Robert's interest in legal title is personalty, and does not constitute any interest in the real property at issue. The United States faults Orma for her failure to articulate "the extent to which an equitable ownership interest impacts on the legal title maintained by the vendor of the contract for deed (here, Mr. McPherson)." Doc. No. 24 at 6. The precise impact of Orma's interest is established by *Kern*, *Wooten* and *Rickner*, none of which are addressed by the United States and all of which stand for the proposition that "a contract for the sale of property converts the seller's interest from an owner of real property to that of an owner of personalty, this being the doctrine of equitable conversion." *Rickner*, 164 Mont. at 55, 518 P.2d 1160.

Notwithstanding the severe limitations on Robert's remaining interest in the property, bare legal title is probably enough to establish the requisite nexus between Robert and the vacation property. The United States having met its burden, the burden now shifts back to Orma to show that the levy is wrongful. This she can do without difficulty.

### 3. Is the Levy Wrongful?

The relevant section of the Code of Federal Regulations sets forth four scenarios under which an IRS levy is wrongful. 26 C.F.R. § 301.7426–1(b)(1). The theory of wrongful levy advanced by the Plaintiff in this case is contained in subparagraph (d) and provides that a levy is wrongful if "the levy or sale pursuant to levy will or does effectively destroy or otherwise irreparably injure [the Plaintiff's] interest in the property which is senior to the Federal tax lien." *Id.* The more applicable theory is set forth in subparagraph (b), stating that a levy is wrongful if "the levy is upon property in which the taxpayer had no interest at the time the lien arose or thereafter."

Such is the case here. Robert's interest at the time of his failure to pay income tax in 1995 was an interest in personal property; his interest in the vacation property was non-existent. Moreover, Orma had long since performed her obligations under the Declaration of Trust and was entitled to a deed granting her full legal title as well. The levy is similarly wrongful under this Court's opinion in *Turk,* in which the Court explained that a plaintiff might show a levy was wrongful by "showing that his interest is senior to the IRS's or that he was a bona-fide purchaser." 127 F.Supp.2d at 1167. In Orma's case, both examples apply; she is a bona-fide purchaser pursuant to a contract for deed and her interest is senior to the IRS's.

Equitable considerations also favor finding that levy wrongful. While it is true that Robert and Orma, as a matter of fact, have jointly contributed to the purchase and upkeep of the vacation property, the Declaration of Trust is a valid contract for deed by which Robert agreed to convey his interest to Orma for something more than straw consideration. The transaction occurred in 1978, long before Robert and Orma could have anticipated Robert's tax liabilities in the 1990s, and the Declaration of Trust evidences a contemporaneous intent on the part of both Robert and Orma to see that the ownership interest in the vacation property would ultimately rest entirely with Orma. The effect of that transfer at present is to allow Robert to preserve his use and enjoyment of a very desirable vacation property despite his massive tax debt and despite the fact that he is the legal title holder. These facts, while seeming to suggest that Robert has escaped responsibility for his tax obligations based on legalisms and technicalities, are trumped by the 17–year interval between the execution of the Declaration of Trust and the genesis of Robert's tax trouble, which constitutes compelling proof that the transfer to Orma, however imperfectly executed and however unseemly the present effects, was genuine.

Orma has succeeded in demonstrating that she has an interest in the vacation property and that the IRS levy is wrongful, and she is entitled to judgment as a matter of law. Under 26 U.S.C. § 7426(b)(1) and 26 C.F.R. § 301.7426–1(b)(1)(i), the appropriate remedy here to issue an injunction prohibiting the enforcement of the levy or to prohibit the forced sale of the property.

### IV. Order

Based on the foregoing, Orma's motion for summary judgment (Doc. No. 16) is GRANTED, and the United States' motion for summary judgment (Doc. No. 19) is DENIED. The United States is permanently enjoined and prohibited from enforcing the levy and the forced sale of the vacation property. The Clerk shall enter judgment in favor of Orma and against the United States.